TENNESSEE *v.* GARNER ET AL.

No. 83–1035.   Argued October 30, 1984—Decided March 27, 1985*

*Together with No. 83–1070, *Memphis Police Department et al.* v. *Garner et al.*, on certiorari to the same court.

1

WHITE, J., delivered the opinion of the Court, in which BRENNAN, MAR-SHALL, BLACKMUN, POWELL, and STEVENS, JJ., joined. O'CONNOR, J., filed a dissenting opinion, in which BURGER, C. J., and REHNQUIST, J., joined, *post*, p. 22.

*Henry L. Klein* argued the cause for petitioners in No. 83–1070. With him on the briefs were *Clifford D. Pierce, Jr., Charles V. Holmes,* and *Paul F. Goodman. W. J. Michael Cody,* Attorney General of Tennessee, argued the cause for appellant in No. 83–1035. With him on the briefs were *William M. Leech, Jr.,* former Attorney General, and *Jerry L. Smith,* Assistant Attorney General.

*Steven L. Winter* argued the cause for appellee-respondent Garner. With him on the brief was *Walter L. Bailey, Jr.*†

JUSTICE WHITE delivered the opinion of the Court.

This case requires us to determine the constitutionality of the use of deadly force to prevent the escape of an apparently unarmed suspected felon. We conclude that such force may not be used unless it is necessary to prevent the escape and the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others.

I

At about 10:45 p. m. on October 3, 1974, Memphis Police Officers Elton Hymon and Leslie Wright were dispatched to answer a "prowler inside call." Upon arriving at the scene they saw a woman standing on her porch and gesturing toward the adjacent house.[1] She told them she had heard glass breaking and that "they" or "someone" was breaking in next door. While Wright radioed the dispatcher to say that they were on the scene, Hymon went behind the house. He heard a door slam and saw someone run across the backyard. The fleeing suspect, who was appellee-respondent's decedent, Edward Garner, stopped at a 6-feet-high chain link fence at the edge of the yard. With the aid of a flashlight, Hymon was able to see Garner's face and hands. He saw no sign of a weapon, and, though not certain, was "reasonably sure" and "figured" that Garner was unarmed. App. 41, 56; Record 219. He thought Garner was 17 or 18 years old and

---

†Briefs of *amici curiae* urging affirmance were filed for the Florida Chapter of the National Bar Association by *Deitra Micks;* and for the Police Foundation et al. by *William Josephson, Robert Kasanof, Philip Lacovara,* and *Margaret Bush Wilson.*

[1] The owner of the house testified that no lights were on in the house, but that a back door light was on. Record 160. Officer Hymon, though uncertain, stated in his deposition that there were lights on in the house. *Id.*, at 209.

about 5′ 5″ or 5′ 7″ tall.[2]  While Garner was crouched at the base of the fence, Hymon called out "police, halt" and took a few steps toward him.  Garner then began to climb over the fence.  Convinced that if Garner made it over the fence he would elude capture,[3] Hymon shot him.  The bullet hit Garner in the back of the head.  Garner was taken by ambulance to a hospital, where he died on the operating table.  Ten dollars and a purse taken from the house were found on his body.[4]

In using deadly force to prevent the escape, Hymon was acting under the authority of a Tennessee statute and pursuant to Police Department policy.  The statute provides that "[i]f, after notice of the intention to arrest the defendant, he either flee or forcibly resist, the officer may use all the necessary means to effect the arrest."  Tenn. Code Ann.

---

[2] In fact, Garner, an eighth-grader, was 15.  He was 5′ 4″ tall and weighed somewhere around 100 or 110 pounds.  App. to Pet. for Cert. A5.

[3] When asked at trial why he fired, Hymon stated:

"Well, first of all it was apparent to me from the little bit that I knew about the area at the time that he was going to get away because, number 1, I couldn't get to him.  My partner then couldn't find where he was because, you know, he was late coming around.  He didn't know where I was talking about.  I couldn't get to him because of the fence here, I couldn't have jumped this fence and come up, consequently jumped this fence and caught him before he got away because he was already up on the fence, just one leap and he was already over the fence, and so there is no way that I could have caught him."  App. 52.

He also stated that the area beyond the fence was dark, that he could not have gotten over the fence easily because he was carrying a lot of equipment and wearing heavy boots, and that Garner, being younger and more energetic, could have outrun him.  Id., at 53–54.

[4] Garner had rummaged through one room in the house, in which, in the words of the owner, "[a]ll the stuff was out on the floors, all the drawers was pulled out, and stuff was scattered all over."  Id., at 34.  The owner testified that his valuables were untouched but that, in addition to the purse and the 10 dollars, one of his wife's rings was missing.  The ring was not recovered.  Id., at 34–35.

§ 40–7–108 (1982).[5] The Department policy was slightly more restrictive than the statute, but still allowed the use of deadly force in cases of burglary. App. 140–144. The incident was reviewed by the Memphis Police Firearm's Review Board and presented to a grand jury. Neither took any action. *Id.*, at 57.

Garner's father then brought this action in the Federal District Court for the Western District of Tennessee, seeking damages under 42 U. S. C. § 1983 for asserted violations of Garner's constitutional rights. The complaint alleged that the shooting violated the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution. It named as defendants Officer Hymon, the Police Department, its Director, and the Mayor and city of Memphis. After a 3-day bench trial, the District Court entered judgment for all defendants. It dismissed the claims against the Mayor and the Director for lack of evidence. It then concluded that Hymon's actions were authorized by the Tennessee statute, which in turn was constitutional. Hymon had employed the only reasonable and practicable means of preventing Garner's escape. Garner had "recklessly and heedlessly attempted to vault over the fence to escape, thereby assuming the risk of being fired upon." App. to Pet. for Cert. A10.

The Court of Appeals for the Sixth Circuit affirmed with regard to Hymon, finding that he had acted in good-faith reliance on the Tennessee statute and was therefore within the scope of his qualified immunity. 600 F. 2d 52 (1979). It remanded for reconsideration of the possible liability of the city, however, in light of *Monell* v. *New York City Dept. of Social Services*, 436 U. S. 658 (1978), which had come down after the District Court's decision. The District Court was

---

[5] Although the statute does not say so explicitly, Tennessee law forbids the use of deadly force in the arrest of a misdemeanant. See *Johnson* v. *State*, 173 Tenn. 134, 114 S. W. 2d 819 (1938).

6

directed to consider whether a city enjoyed a qualified immunity, whether the use of deadly force and hollow point bullets in these circumstances was constitutional, and whether any unconstitutional municipal conduct flowed from a "policy or custom" as required for liability under *Monell*. 600 F. 2d, at 54–55.

The District Court concluded that *Monell* did not affect its decision. While acknowledging some doubt as to the possible immunity of the city, it found that the statute, and Hymon's actions, were constitutional. Given this conclusion, it declined to consider the "policy or custom" question. App. to Pet. for Cert. A37–A39.

The Court of Appeals reversed and remanded. 710 F. 2d 240 (1983). It reasoned that the killing of a fleeing suspect is a "seizure" under the Fourth Amendment,[6] and is therefore constitutional only if "reasonable." The Tennessee statute failed as applied to this case because it did not adequately limit the use of deadly force by distinguishing between felonies of different magnitudes—"the facts, as found, did not justify the use of deadly force under the Fourth Amendment." *Id.*, at 246. Officers cannot resort to deadly force unless they "have probable cause . . . to believe that the suspect [has committed a felony and] poses a threat to the safety of the officers or a danger to the community if left at large." *Ibid.*[7]

---

[6] "The right of the people to be secure in their persons . . . against unreasonable searches and seizures, shall not be violated . . . ." U. S. Const., Amdt. 4.

[7] The Court of Appeals concluded that the rule set out in the Model Penal Code "accurately states Fourth Amendment limitations on the use of deadly force against fleeing felons." 710 F. 2d, at 247. The relevant portion of the Model Penal Code provides:

"The use of deadly force is not justifiable . . . unless (i) the arrest is for a felony; and (ii) the person effecting the arrest is authorized to act as a peace officer or is assisting a person whom he believes to be authorized to act as a peace officer; and (iii) the actor believes that the force employed creates no substantial risk of injury to innocent persons; and (iv) the actor believes

The State of Tennessee, which had intervened to defend the statute, see 28 U. S. C. § 2403(b), appealed to this Court. The city filed a petition for certiorari. We noted probable jurisdiction in the appeal and granted the petition. 465 U. S. 1098 (1984).

## II

Whenever an officer restrains the freedom of a person to walk away, he has seized that person. *United States* v. *Brignoni-Ponce*, 422 U. S. 873, 878 (1975). While it is not always clear just when minimal police interference becomes a seizure, see *United States* v. *Mendenhall*, 446 U. S. 544 (1980), there can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment.

### A

A police officer may arrest a person if he has probable cause to believe that person committed a crime. *E. g.*, *United States* v. *Watson*, 423 U. S. 411 (1976). Petitioners and appellant argue that if this requirement is satisfied the Fourth Amendment has nothing to say about *how* that seizure is made. This submission ignores the many cases in which this Court, by balancing the extent of the intrusion against the need for it, has examined the reasonableness of

that (1) the crime for which the arrest is made involved conduct including the use or threatened use of deadly force; or (2) there is a substantial risk that the person to be arrested will cause death or serious bodily harm if his apprehension is delayed." American Law Institute, Model Penal Code § 3.07(2)(b) (Proposed Official Draft 1962).

The court also found that "[a]n analysis of the facts of this case under the Due Process Clause" required the same result, because the statute was not narrowly drawn to further a compelling state interest. 710 F. 2d, at 246–247. The court considered the generalized interest in effective law enforcement sufficiently compelling only when the the suspect is dangerous. Finally, the court held, relying on *Owen* v. *City of Independence*, 445 U. S. 622 (1980), that the city was not immune.

the manner in which a search or seizure is conducted. To determine the constitutionality of a seizure "[w]e must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *United States* v. *Place*, 462 U. S. 696, 703 (1983); see *Delaware* v. *Prouse*, 440 U. S. 648, 654 (1979); *United States* v. *Martinez-Fuerte*, 428 U. S. 543, 555 (1976). We have described "the balancing of competing interests" as "the key principle of the Fourth Amendment." *Michigan* v. *Summers*, 452 U. S. 692, 700, n. 12 (1981). See also *Camara* v. *Municipal Court*, 387 U. S. 523, 536–537 (1967). Because one of the factors is the extent of the intrusion, it is plain that reasonableness depends on not only when a seizure is made, but also how it is carried out. *United States* v. *Ortiz*, 422 U. S. 891, 895 (1975); *Terry* v. *Ohio*, 392 U. S. 1, 28–29 (1968).

Applying these principles to particular facts, the Court has held that governmental interests did not support a lengthy detention of luggage, *United States* v. *Place, supra,* an airport seizure not "carefully tailored to its underlying justification," *Florida* v. *Royer,* 460 U. S. 491, 500 (1983) (plurality opinion), surgery under general anesthesia to obtain evidence, *Winston* v. *Lee,* 470 U. S. 753 (1985), or detention for fingerprinting without probable cause, *Davis* v. *Mississippi,* 394 U. S. 721 (1969); *Hayes* v. *Florida,* 470 U. S. 811 (1985). On the other hand, under the same approach it has upheld the taking of fingernail scrapings from a suspect, *Cupp* v. *Murphy,* 412 U. S. 291 (1973), an unannounced entry into a home to prevent the destruction of evidence, *Ker* v. *California,* 374 U. S. 23 (1963), administrative housing inspections without probable cause to believe that a code violation will be found, *Camara* v. *Municipal Court, supra,* and a blood test of a drunken-driving suspect, *Schmerber* v. *California,* 384 U. S. 757 (1966). In each of these cases, the question was whether

the totality of the circumstances justified a particular sort of search or seizure.

## B

The same balancing process applied in the cases cited above demonstrates that, notwithstanding probable cause to seize a suspect, an officer may not always do so by killing him. The intrusiveness of a seizure by means of deadly force is unmatched. The suspect's fundamental interest in his own life need not be elaborated upon. The use of deadly force also frustrates the interest of the individual, and of society, in judicial determination of guilt and punishment. Against these interests are ranged governmental interests in effective law enforcement.[8] It is argued that overall violence will be reduced by encouraging the peaceful submission of suspects who know that they may be shot if they flee. Effectiveness in making arrests requires the resort to deadly

---

[8] The dissent emphasizes that subsequent investigation cannot replace immediate apprehension. We recognize that this is so, see n. 13, *infra;* indeed, that is the reason why there is any dispute. If subsequent arrest were assured, no one would argue that use of deadly force was justified. Thus, we proceed on the assumption that subsequent arrest is not likely. Nonetheless, it should be remembered that failure to apprehend at the scene does not necessarily mean that the suspect will never be caught.

In lamenting the inadequacy of later investigation, the dissent relies on the report of the President's Commission on Law Enforcement and Administration of Justice. It is worth noting that, notwithstanding its awareness of this problem, the Commission itself proposed a policy for use of deadly force arguably even more stringent than the formulation we adopt today. See President's Commission on Law Enforcement and Administration of Justice, Task Force Report: The Police 189 (1967). The Commission proposed that deadly force be used only to apprehend "perpetrators who, in the course of their crime threatened the use of deadly force, or if the officer believes there is a substantial risk that the person whose arrest is sought will cause death or serious bodily harm if his apprehension is delayed." In addition, the officer would have "to know, as a virtual certainty, that the suspect committed an offense for which the use of deadly force is permissible." *Ibid.*

force, or at least the meaningful threat thereof. "Being able to arrest such individuals is a condition precedent to the state's entire system of law enforcement." Brief for Petitioners 14.

Without in any way disparaging the importance of these goals, we are not convinced that the use of deadly force is a sufficiently productive means of accomplishing them to justify the killing of nonviolent suspects. Cf. *Delaware* v. *Prouse, supra,* at 659. The use of deadly force is a self-defeating way of apprehending a suspect and so setting the criminal justice mechanism in motion. If successful, it guarantees that that mechanism will not be set in motion. And while the meaningful threat of deadly force might be thought to lead to the arrest of more live suspects by discouraging escape attempts,[9] the presently available evidence does not support this thesis.[10] The fact is that a majority of police de-

[9] We note that the usual manner of deterring illegal conduct—through punishment—has been largely ignored in connection with flight from arrest. Arkansas, for example, specifically excepts flight from arrest from the offense of "obstruction of governmental operations." The commentary notes that this "reflects the basic policy judgment that, absent the use of force or violence, a mere attempt to avoid apprehension by a law enforcement officer does not give rise to an independent offense." Ark. Stat. Ann. § 41–2802(3)(a) (1977) and commentary. In the few States that do outlaw flight from an arresting officer, the crime is only a misdemeanor. See, *e. g.,* Ind. Code § 35–44–3–3 (1982). Even forceful resistance, though generally a separate offense, is classified as a misdemeanor. *E. g.,* Ill. Rev. Stat., ch. 38, ¶ 31–1 (1984); Mont. Code Ann. § 45–7–301 (1984); N. H. Rev. Stat. Ann. § 642:2 (Supp. 1983); Ore. Rev. Stat. § 162.315 (1983).

This lenient approach does avoid the anomaly of automatically transforming every fleeing misdemeanant into a fleeing felon—subject, under the common-law rule, to apprehension by deadly force—solely by virtue of his flight. However, it is in real tension with the harsh consequences of flight in cases where deadly force is employed. For example, Tennessee does not outlaw fleeing from arrest. The Memphis City Code does, § 22–34.1 (Supp. 17, 1971), subjecting the offender to a maximum fine of $50, § 1–8 (1967). Thus, Garner's attempted escape subjected him to (a) a $50 fine, and (b) being shot.

[10] See Sherman, Reducing Police Gun Use, in Control in the Police Organization 98, 120–123 (M. Punch ed. 1983); Fyfe, Observations on Police

partments in this country have forbidden the use of deadly force against nonviolent suspects. See *infra*, at 18–19. If those charged with the enforcement of the criminal law have abjured the use of deadly force in arresting nondangerous felons, there is a substantial basis for doubting that the use of such force is an essential attribute of the arrest power in all felony cases. See *Schumann* v. *McGinn*, 307 Minn. 446, 472, 240 N. W. 2d 525, 540 (1976) (Rogosheske, J., dissenting in part). Petitioners and appellant have not persuaded us that shooting nondangerous fleeing suspects is so vital as to outweigh the suspect's interest in his own life.

The use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable. It is not better that all felony suspects die than that they escape. Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so. It is no doubt unfortunate when a suspect who is in sight escapes, but the fact that the police arrive a little late or are a little slower afoot does not always justify killing the suspect. A police officer may not seize an unarmed, nondangerous suspect by shooting him dead. The Tennessee statute is unconstitutional insofar as it authorizes the use of deadly force against such fleeing suspects.

It is not, however, unconstitutional on its face. Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force. Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where

Deadly Force, 27 Crime & Delinquency 376, 378–381 (1981); W. Geller & K. Karales, Split-Second Decisions 67 (1981); App. 84 (affidavit of William Bracey, Chief of Patrol, New York City Police Department). See generally Brief for Police Foundation et al. as *Amici Curiae*.

feasible, some warning has been given. As applied in such circumstances, the Tennessee statute would pass constitutional muster.

### III

### A

It is insisted that the Fourth Amendment must be construed in light of the common-law rule, which allowed the use of whatever force was necessary to effect the arrest of a fleeing felon, though not a misdemeanant. As stated in Hale's posthumously published Pleas of the Crown:

> "[I]f persons that are pursued by these officers for felony or the just suspicion thereof . . . shall not yield themselves to these officers, but shall either resist or fly before they are apprehended or being apprehended shall rescue themselves and resist or fly, so that they cannot be otherwise apprehended, and are upon necessity slain therein, because they cannot be otherwise taken, it is no felony." 2 M. Hale, Historia Placitorum Coronae 85 (1736).

See also 4 W. Blackstone, Commentaries *289. Most American jurisdictions also imposed a flat prohibition against the use of deadly force to stop a fleeing misdemeanant, coupled with a general privilege to use such force to stop a fleeing felon. *E. g., Holloway* v. *Moser*, 193 N. C. 185, 136 S. E. 375 (1927); *State* v. *Smith*, 127 Iowa 534, 535, 103 N. W. 944, 945 (1905); *Reneau* v. *State*, 70 Tenn. 720 (1879); *Brooks* v. *Commonwealth*, 61 Pa. 352 (1869); *Roberts* v. *State*, 14 Mo. 138 (1851); see generally R. Perkins & R. Boyce, Criminal Law 1098–1102 (3d ed. 1982); Day, Shooting the Fleeing Felon: State of the Law, 14 Crim. L. Bull. 285, 286–287 (1978); Wilgus, Arrest Without a Warrant, 22 Mich. L. Rev. 798, 807–816 (1924). But see *Storey* v. *State*, 71 Ala. 329 (1882); *State* v. *Bryant*, 65 N. C. 327, 328 (1871); *Caldwell* v. *State*, 41 Tex. 86 (1874).

The State and city argue that because this was the prevailing rule at the time of the adoption of the Fourth Amendment and for some time thereafter, and is still in force in some States, use of deadly force against a fleeing felon must be "reasonable." It is true that this Court has often looked to the common law in evaluating the reasonableness, for Fourth Amendment purposes, of police activity. See, *e. g.*, *United States* v. *Watson*, 423 U. S. 411, 418–419 (1976); *Gerstein* v. *Pugh*, 420 U. S. 103, 111, 114 (1975); *Carroll* v. *United States*, 267 U. S. 132, 149–153 (1925). On the other hand, it "has not simply frozen into constitutional law those law enforcement practices that existed at the time of the Fourth Amendment's passage." *Payton* v. *New York*, 445 U. S. 573, 591, n. 33 (1980). Because of sweeping change in the legal and technological context, reliance on the common-law rule in this case would be a mistaken literalism that ignores the purposes of a historical inquiry.

## B

It has been pointed out many times that the common-law rule is best understood in light of the fact that it arose at a time when virtually all felonies were punishable by death.[11] "Though effected without the protections and formalities of an orderly trial and conviction, the killing of a resisting or

---

[11] The roots of the concept of a "felony" lie not in capital punishment but in forfeiture. 2 F. Pollock & F. Maitland, The History of English Law 465 (2d ed. 1909) (hereinafter Pollock & Maitland). Not all felonies were always punishable by death. See *id.*, at 466–467, n. 3. Nonetheless, the link was profound. Blackstone was able to write: "The idea of felony is indeed so generally connected with that of capital punishment, that we find it hard to separate them; and to this usage the interpretations of the law do now conform. And therefore if a statute makes any new offence felony, the law implies that is shall be punished with death, *viz.* by hanging, as well as with forfeiture . . . ." 4 W. Blackstone, Commentaries *98. See also R. Perkins & R. Boyce, Criminal Law 14–15 (3d ed. 1982); 2 Pollock & Maitland 511.

fleeing felon resulted in no greater consequences than those authorized for punishment of the felony of which the individual was charged or suspected." American Law Institute, Model Penal Code § 3.07, Comment 3, p. 56 (Tentative Draft No. 8, 1958) (hereinafter Model Penal Code Comment). Courts have also justified the common-law rule by emphasizing the relative dangerousness of felons. See, *e. g.*, *Schumann* v. *McGinn*, 307 Minn., at 458, 240 N. W. 2d, at 533; *Holloway* v. *Moser, supra*, at 187, 136 S. E., at 376 (1927).

Neither of these justifications makes sense today. Almost all crimes formerly punishable by death no longer are or can be. See, *e. g.*, *Enmund* v. *Florida*, 458 U. S. 782 (1982); *Coker* v. *Georgia*, 433 U. S. 584 (1977). And while in earlier times "the gulf between the felonies and the minor offences was broad and deep," 2 Pollock & Maitland 467, n. 3; *Carroll* v. *United States, supra*, at 158, today the distinction is minor and often arbitrary. Many crimes classified as misdemeanors, or nonexistent, at common law are now felonies. Wilgus, 22 Mich. L. Rev., at 572–573. These changes have undermined the concept, which was questionable to begin with, that use of deadly force against a fleeing felon is merely a speedier execution of someone who has already forfeited his life. They have also made the assumption that a "felon" is more dangerous than a misdemeanant untenable. Indeed, numerous misdemeanors involve conduct more dangerous than many felonies.[12]

There is an additional reason why the common-law rule cannot be directly translated to the present day. The common-law rule developed at a time when weapons were rudimentary. Deadly force could be inflicted almost solely in a hand-to-hand struggle during which, necessarily, the safety

---

[12] White-collar crime, for example, poses a less significant physical threat than, say, drunken driving. See *Welsh* v. *Wisconsin*, 466 U. S. 740 (1984); *id.*, at 755 (BLACKMUN, J., concurring). See Model Penal Code Comment, at 57.

of the arresting officer was at risk.   Handguns were not carried by police officers until the latter half of the last century. L. Kennett & J. Anderson, The Gun in America 150–151 (1975).   Only then did it become possible to use deadly force from a distance as a means of apprehension.   As a practical matter, the use of deadly force under the standard articulation of the common-law rule has an altogether different meaning—and harsher consequences—now than in past centuries.   See Wechsler & Michael, A Rationale for the Law of Homicide: I, 37 Colum. L. Rev. 701, 741 (1937).[18]

One other aspect of the common-law rule bears emphasis. It forbids the use of deadly force to apprehend a misdemeanant, condemning such action as disproportionately severe.   See *Holloway* v. *Moser*, 193 N. C., at 187, 136 S. E., at 376; *State* v. *Smith*, 127 Iowa, at 535, 103 N. W., at 945. See generally Annot., 83 A. L. R. 3d 238 (1978).

In short, though the common-law pedigree of Tennessee's rule is pure on its face, changes in the legal and technological context mean the rule is distorted almost beyond recognition when literally applied.

## C

In evaluating the reasonableness of police procedures under the Fourth Amendment, we have also looked to pre-

---

[18] It has been argued that sophisticated techniques of apprehension and increased communication between the police in different jurisdictions have made it more likely that an escapee will be caught than was once the case, and that this change has also reduced the "reasonableness" of the use of deadly force to prevent escape.   *E. g.,* Sherman, Execution Without Trial: Police Homicide and the Constitution, 33 Vand. L. Rev. 71, 76 (1980).   We are unaware of any data that would permit sensible evaluation of this claim.   Current arrest rates are sufficiently low, however, that we have some doubt whether in past centuries the failure to arrest at the scene meant that the police had missed their only chance in a way that is not presently the case.   In 1983, 21% of the offenses in the Federal Bureau of Investigation crime index were cleared by arrest.   Federal Bureau of Investigation, Uniform Crime Reports, Crime in the United States 159 (1984).   The clearance rate for burglary was 15%.   *Ibid.*

vailing rules in individual jurisdictions. See, *e. g., United States* v. *Watson,* 423 U. S., at 421–422. The rules in the States are varied. See generally Comment, 18 Ga. L. Rev. 137, 140–144 (1983). Some 19 States have codified the common-law rule,[14] though in two of these the courts have significantly limited the statute.[15] Four States, though without a relevant statute, apparently retain the common-law rule.[16] Two States have adopted the Model Penal Code's

---

[14] Ala. Code § 13A–3–27 (1982); Ark. Stat. Ann. § 41–510 (1977); Cal. Penal Code Ann. § 196 (West 1970); Conn. Gen. Stat. § 53a–22 (1972); Fla. Stat. § 776.05 (1983); Idaho Code § 19–610 (1979); Ind. Code § 35–41–3–3 (1982); Kan. Stat. Ann. § 21–3215 (1981); Miss. Code Ann. § 97–3–15(d) (Supp. 1984); Mo. Rev. Stat. § 563.046 (1979); Nev. Rev. Stat. § 200.140 (1983); N. M. Stat. Ann. § 30–2–6 (1984); Okla. Stat., Tit. 21, § 732 (1981); R. I. Gen. Laws § 12–7–9 (1981); S. D. Codified Laws §§ 22–16–32, 22–16–33 (1979); Tenn. Code Ann. § 40–7–108 (1982); Wash. Rev. Code § 9A.16.040(3) (1977). Oregon limits use of deadly force to violent felons, but also allows its use against any felon if "necessary." Ore. Rev. Stat. § 161.239 (1983). Wisconsin's statute is ambiguous, but should probably be added to this list. Wis. Stat. § 939.45(4) (1981–1982) (officer may use force necessary for "a reasonable accomplishment of a lawful arrest"). But see *Clark* v. *Ziedonis,* 368 F. Supp. 544 (ED Wis. 1973), aff'd on other grounds, 513 F. 2d 79 (CA7 1975).

[15] In California, the police may use deadly force to arrest only if the crime for which the arrest is sought was "a forcible and atrocious one which threatens death or serious bodily harm," or there is a substantial risk that the person whose arrest is sought will cause death or serious bodily harm if apprehension is delayed. *Kortum* v. *Alkire,* 69 Cal. App. 3d 325, 333, 138 Cal. Rptr. 26, 30–31 (1977). See also *People* v. *Ceballos,* 12 Cal. 3d 470, 476–484, 526 P. 2d 241, 245–250 (1974); *Long Beach Police Officers Assn.* v. *Long Beach,* 61 Cal. App. 3d 364, 373–374, 132 Cal. Rptr. 348, 353–354 (1976). In Indiana, deadly force may be used only to prevent injury, the imminent danger of injury or force, or the threat of force. It is not permitted simply to prevent escape. *Rose* v. *State,* 431 N. E. 2d 521 (Ind. App. 1982).

[16] These are Michigan, Ohio, Virginia, and West Virginia. *Werner* v. *Hartfelder,* 113 Mich. App. 747, 318 N. W. 2d 825 (1982); *State* v. *Foster,* 60 Ohio Misc. 46, 59–66, 396 N. E. 2d 246, 255–258 (Com. Pl. 1979) (citing cases); *Berry* v. *Hamman,* 203 Va. 596, 125 S. E. 2d 851 (1962); *Thompson* v. *Norfolk & W. R. Co.,* 116 W. Va. 705, 711–712, 182 S. E. 880, 883–884 (1935).

provision verbatim.[17]   Eighteen others allow, in slightly vary-
ing language, the use of deadly force only if the suspect has
committed a felony involving the use or threat of physical or
deadly force, or is escaping with a deadly weapon, or is likely to
endanger life or inflict serious physical injury if not arrested.[18]
Louisiana and Vermont, though without statutes or case law on
point, do forbid the use of deadly force to prevent any but
violent felonies.[19]   The remaining States either have no rele-
vant statute or case law, or have positions that are unclear.[20]

[17] Haw. Rev. Stat. § 703–307 (1976); Neb. Rev. Stat. § 28–1412 (1979).
Massachusetts probably belongs in this category.   Though it once rejected
distinctions between felonies, *Uraneck* v. *Lima*, 359 Mass. 749, 750, 269
N. E. 2d 670, 671 (1971), it has since adopted the Model Penal Code limita-
tions with regard to private citizens, *Commonwealth* v. *Klein*, 372 Mass.
823, 363 N. E. 2d 1313 (1977), and seems to have extended that decision to
police officers, *Julian* v. *Randazzo*, 380 Mass. 391, 403 N. E. 2d 931 (1980).

[18] Alaska Stat. Ann. § 11.81.370(a) (1983); Ariz. Rev. Stat. Ann. § 13–410
(1978); Colo. Rev. Stat. § 18–1–707 (1978); Del. Code Ann., Tit. 11, § 467
(1979) (felony involving physical force *and* a substantial risk that the sus-
pect will cause death or serious bodily injury *or* will never be recaptured);
Ga. Code § 16–3–21(a) (1984); Ill. Rev. Stat., ch. 38, ¶ 7–5 (1984); Iowa
Code § 804.8 (1983) (suspect has used or threatened deadly force in commis-
sion of a felony, or would use deadly force if not caught); Ky. Rev. Stat.
§ 503.090 (1984) (suspect committed felony involving use or threat of physi-
cal force likely to cause death or serious injury, *and* is likely to endanger
life unless apprehended without delay); Me. Rev. Stat. Ann., Tit. 17–A,
§ 107 (1983) (commentary notes that deadly force may be used only "where
the person to be arrested poses a threat to human life"); Minn. Stat.
§ 609.066 (1984); N. H. Rev. Stat. Ann. § 627:5(II) (Supp. 1983); N. J.
Stat. Ann. § 2C–3–7 (West 1982); N. Y. Penal Law § 35.30 (McKinney
Supp. 1984–1985); N. C. Gen. Stat. § 15A–401 (1983); N. D. Cent. Code
§ 12.1–05–07.2.d (1976); 18 Pa. Cons. Stat. § 508 (1982); Tex. Penal Code
Ann. § 9.51(c) (1974); Utah Code Ann. § 76–2–404 (1978).

[19] See La. Rev. Stat. Ann. § 14:20(2) (West 1974); Vt. Stat. Ann., Tit. 13,
§ 2305 (1974 and Supp. 1984).   A Federal District Court has interpreted
the Louisiana statute to limit the use of deadly force against fleeing sus-
pects to situations where "life itself is endangered or great bodily harm is
threatened." *Sauls* v. *Hutto*, 304 F. Supp. 124, 132 (ED La. 1969).

[20] These are Maryland, Montana, South Carolina, and Wyoming.   A
Maryland appellate court has indicated, however, that deadly force may
not be used against a felon who "was in the process of fleeing and, at the

18

It cannot be said that there is a constant or overwhelming trend away from the common-law rule. In recent years, some States have reviewed their laws and expressly rejected abandonment of the common-law rule.[21] Nonetheless, the long-term movement has been away from the rule that deadly force may be used against any fleeing felon, and that remains the rule in less than half the States.

This trend is more evident and impressive when viewed in light of the policies adopted by the police departments themselves. Overwhelmingly, these are more restrictive than the common-law rule. C. Milton, J. Halleck, J. Lardner, & G. Abrecht, Police Use of Deadly Force 45–46 (1977). The Federal Bureau of Investigation and the New York City Police Department, for example, both forbid the use of firearms except when necessary to prevent death or grievous bodily harm. *Id.*, at 40–41; App. 83. For accreditation by the Commission on Accreditation for Law Enforcement Agencies, a department must restrict the use of deadly force to situations where "the officer reasonably believes that the action is in defense of human life . . . or in defense of any person in immediate danger of serious physical injury." Commission on Accreditation for Law Enforcement Agencies, Inc., Standards for Law Enforcement Agencies 1–2 (1983) (italics deleted). A 1974 study reported that the police department regulations in a majority of the large cities of the United States allowed the firing of a weapon only when a

---

time, presented no immediate danger to . . . anyone . . . ." *Giant Food, Inc.* v. *Scherry*, 51 Md. App. 586, 589, 596, 444 A. 2d 483, 486, 489 (1982).

[21] In adopting its current statute in 1979, for example, Alabama expressly chose the common-law rule over more restrictive provisions. Ala. Code § 13A–3–27, Commentary, pp. 67–€3 (1982). Missouri likewise considered but rejected a proposal akin to the Model Penal Code rule. See *Mattis* v. *Schnarr*, 547 F. 2d 1007, 1022 (CA8 1976) (Gibson, C. J., dissenting), vacated as moot *sub nom. Ashcroft* v. *Mattis*, 431 U. S. 171 (1977). Idaho, whose current statute codifies the common-law rule, adopted the Model Penal Code in 1971, but abandoned it in 1972.

felon presented a threat of death or serious bodily harm. Boston Police Department, Planning & Research Division, The Use of Deadly Force by Boston Police Personnel (1974), cited in *Mattis* v. *Schnarr*, 547 F. 2d 1007, 1016, n. 19 (CA8 1976), vacated as moot *sub nom. Ashcroft* v. *Mattis*, 431 U. S. 171 (1977). Overall, only 7.5% of departmental and municipal policies explicitly permit the use of deadly force against any felon; 86.8% explicitly do not. K. Matulia, A Balance of Forces: A Report of the International Association of Chiefs of Police 161 (1982) (table). See also Record 1108–1368 (written policies of 44 departments). See generally W. Geller & K. Karales, Split-Second Decisions 33–42 (1981); Brief for Police Foundation et al. as *Amici Curiae.* In light of the rules adopted by those who must actually administer them, the older and fading common-law view is a dubious indicium of the constitutionality of the Tennessee statute now before us.

## D

Actual departmental policies are important for an additional reason. We would hesitate to declare a police practice of long standing "unreasonable" if doing so would severely hamper effective law enforcement. But the indications are to the contrary. There has been no suggestion that crime has worsened in any way in jurisdictions that have adopted, by legislation or departmental policy, rules similar to that announced today. *Amici* note that "[a]fter extensive research and consideration, [they] have concluded that laws permitting police officers to use deadly force to apprehend unarmed, non-violent fleeing felony suspects actually do not protect citizens or law enforcement officers, do not deter crime or alleviate problems caused by crime, and do not improve the crime-fighting ability of law enforcement agencies." *Id.*, at 11. The submission is that the obvious state interests in apprehension are not sufficiently served to warrant the use of lethal weapons against all fleeing felons. See *supra*, at 10–11, and n. 10.

Nor do we agree with petitioners and appellant that the rule we have adopted requires the police to make impossible, split-second evaluations of unknowable facts. See Brief for Petitioners 25; Brief for Appellant 11. We do not deny the practical difficulties of attempting to assess the suspect's dangerousness. However, similarly difficult judgments must be made by the police in equally uncertain circumstances. See, e. g., *Terry* v. *Ohio*, 392 U. S., at 20, 27. Nor is there any indication that in States that allow the use of deadly force only against dangerous suspects, see nn. 15, 17–19, *supra*, the standard has been difficult to apply or has led to a rash of litigation involving inappropriate second-guessing of police officers' split-second decisions. Moreover, the highly technical felony/misdemeanor distinction is equally, if not more, difficult to apply in the field. An officer is in no position to know, for example, the precise value of property stolen, or whether the crime was a first or second offense. Finally, as noted above, this claim must be viewed with suspicion in light of the similar self-imposed limitations of so many police departments.

## IV

The District Court concluded that Hymon was justified in shooting Garner because state law allows, and the Federal Constitution does not forbid, the use of deadly force to prevent the escape of a fleeing felony suspect if no alternative means of apprehension is available. See App. to Pet. for Cert. A9–A11, A38. This conclusion made a determination of Garner's apparent dangerousness unnecessary. The court did find, however, that Garner appeared to be unarmed, though Hymon could not be certain that was the case. *Id.*, at A4, A23. See also App. 41, 56; Record 219. Restated in Fourth Amendment terms, this means Hymon had no articulable basis to think Garner was armed.

In reversing, the Court of Appeals accepted the District Court's factual conclusions and held that "the facts, as found, did not justify the use of deadly force." 710 F. 2d, at 246.

We agree. Officer Hymon could not reasonably have believed that Garner—young, slight, and unarmed—posed any threat. Indeed, Hymon never attempted to justify his actions on any basis other than the need to prevent an escape. The District Court stated in passing that "[t]he facts of this case did not indicate to Officer Hymon that Garner was 'non-dangerous.'" App. to Pet. for Cert. A34. This conclusion is not explained, and seems to be based solely on the fact that Garner had broken into a house at night. However, the fact that Garner was a suspected burglar could not, without regard to the other circumstances, automatically justify the use of deadly force. Hymon did not have probable cause to believe that Garner, whom he correctly believed to be unarmed, posed any physical danger to himself or others.

The dissent argues that the shooting was justified by the fact that Officer Hymon had probable cause to believe that Garner had committed a nighttime burglary. *Post*, at 29, 32. While we agree that burglary is a serious crime, we cannot agree that it is so dangerous as automatically to justify the use of deadly force. The FBI classifies burglary as a "property" rather than a "violent" crime. See Federal Bureau of Investigation, Uniform Crime Reports, Crime in the United States 1 (1984).[22] Although the armed burglar would present a different situation, the fact that an unarmed suspect has broken into a dwelling at night does not automatically mean he is physically dangerous. This case demonstrates as much. See also *Solem* v. *Helm*, 463 U. S. 277, 296–297, and nn. 22–23 (1983). In fact, the available statistics demonstrate that burglaries only rarely involve physical violence. During the 10-year period from 1973–1982, only 3.8% of all burglaries involved violent crime. Bureau of Justice Statistics, House-

---

[22] In a recent report, the Department of Corrections of the District of Columbia also noted that "there is nothing inherently dangerous or violent about the offense," which is a crime against property. D. C. Department of Corrections, Prisoner Screening Project 2 (1985).

hold Burglary 4 (1985).[23]  See also T. Reppetto, Residential Crime 17, 105 (1974); Conklin & Bittner, Burglary in a Suburb, 11 Criminology 208, 214 (1973).

## V

We wish to make clear what our holding means in the context of this case.   The complaint has been dismissed as to all the individual defendants.   The State is a party only by virtue of 28 U. S. C. § 2403(b) and is not subject to liability. The possible liability of the remaining defendants—the Police Department and the city of Memphis—hinges on *Monell* v. *New York City Dept. of Social Services*, 436 U. S. 658 (1978), and is left for remand.   We hold that the statute is invalid insofar as it purported to give Hymon the authority to act as he did.   As for the policy of the Police Department, the absence of any discussion of this issue by the courts below, and the uncertain state of the record, preclude any consideration of its validity.

The judgment of the Court of Appeals is affirmed, and the case is remanded for further proceedings consistent with this opinion.

*So ordered.*

JUSTICE O'CONNOR, with whom THE CHIEF JUSTICE and JUSTICE REHNQUIST join, dissenting.

The Court today holds that the Fourth Amendment prohibits a police officer from using deadly force as a last resort to

---

[23] The dissent points out that three-fifths of all rapes in the home, three-fifths of all home robberies, and about a third of home assaults are committed by burglars.   *Post*, at 26–27.   These figures mean only that if one knows that a suspect committed a rape in the home, there is a good chance that the suspect is also a burglar.   That has nothing to do with the question here, which is whether the fact that someone has committed a burglary indicates that he has committed, or might commit, a violent crime.

The dissent also points out that this 3.8% adds up to 2.8 million violent crimes over a 10-year period, as if to imply that today's holding will let loose 2.8 million violent burglars.   The relevant universe is, of course, far smaller.   At issue is only that tiny fraction of cases where violence has

apprehend a criminal suspect who refuses to halt when flee-
ing the scene of a nighttime burglary. This conclusion rests
on the majority's balancing of the interests of the suspect and
the public interest in effective law enforcement. *Ante*, at 8.
Notwithstanding the venerable common-law rule authorizing
the use of deadly force if necessary to apprehend a fleeing
felon, and continued acceptance of this rule by nearly half the
States, *ante*, at 14, 16–17, the majority concludes that Ten-
nessee's statute is unconstitutional inasmuch as it allows the
use of such force to apprehend a burglary suspect who is not
obviously armed or otherwise dangerous. Although the cir-
cumstances of this case are unquestionably tragic and unfor-
tunate, our constitutional holdings must be sensitive both to
the history of the Fourth Amendment and to the general
implications of the Court's reasoning. By disregarding the
serious and dangerous nature of residential burglaries and
the longstanding practice of many States, the Court effec-
tively creates a Fourth Amendment right allowing a burglary
suspect to flee unimpeded from a police officer who has prob-
able cause to arrest, who has ordered the suspect to halt, and
who has no means short of firing his weapon to prevent
escape. I do not believe that the Fourth Amendment sup-
ports such a right, and I accordingly dissent.

I

The facts below warrant brief review because they high-
light the difficult, split-second decisions police officers must
make in these circumstances. Memphis Police Officers
Elton Hymon and Leslie Wright responded to a late-night
call that a burglary was in progress at a private residence.
When the officers arrived at the scene, the caller said that
"they" were breaking into the house next door. App. in
No. 81–5605 (CA6), p. 207. The officers found the residence
had been forcibly entered through a window and saw lights

---

taken place and an officer who has no other means of apprehending the
suspect is unaware of its occurrence.

on inside the house. Officer Hymon testified that when he saw the broken window he realized "that something was wrong inside," *id.*, at 656, but that he could not determine whether anyone—either a burglar or a member of the household—was within the residence. *Id.*, at 209. As Officer Hymon walked behind the house, he heard a door slam. He saw Edward Eugene Garner run away from the house through the dark and cluttered backyard. Garner crouched next to a 6-foot-high fence. Officer Hymon thought Garner was an adult and was unsure whether Garner was armed because Hymon "had no idea what was in the hand [that he could not see] or what he might have had on his person." *Id.*, at 658–659. In fact, Garner was 15 years old and unarmed. Hymon also did not know whether accomplices remained inside the house. *Id.*, at 657. The officer identified himself as a police officer and ordered Garner to halt. Garner paused briefly and then sprang to the top of the fence. Believing that Garner would escape if he climbed over the fence, Hymon fired his revolver and mortally wounded the suspected burglar.

Appellee-respondent, the deceased's father, filed a 42 U. S. C. § 1983 action in federal court against Hymon, the city of Memphis, and other defendants, for asserted violations of Garner's constitutional rights. The District Court for the Western District of Tennessee held that Officer Hymon's actions were justified by a Tennessee statute that authorizes a police officer to "use all the necessary means to effect the arrest," if "after notice of the intention to arrest the defendant, he either flee or forcibly resist." Tenn. Code Ann. § 40–7–108 (1982). As construed by the Tennessee courts, this statute allows the use of deadly force only if a police officer has probable cause to believe that a person has committed a felony, the officer warns the person that he intends to arrest him, and the officer reasonably believes that no means less than such force will prevent the escape. See, *e. g.*, *Johnson* v. *State*, 173 Tenn. 134, 114 S. W. 2d 819

(1938). The District Court held that the Tennessee statute is constitutional and that Hymon's actions as authorized by that statute did not violate Garner's constitutional rights. The Court of Appeals for the Sixth Circuit reversed on the grounds that the Tennessee statute "authorizing the killing of an unarmed, nonviolent fleeing felon by police in order to prevent escape" violates the Fourth Amendment and the Due Process Clause of the Fourteenth Amendment. 710 F. 2d 240, 244 (1983).

The Court affirms on the ground that application of the Tennessee statute to authorize Officer Hymon's use of deadly force constituted an unreasonable seizure in violation of the Fourth Amendment. The precise issue before the Court deserves emphasis, because both the decision below and the majority obscure what must be decided in this case. The issue is not the constitutional validity of the Tennessee statute on its face or as applied to some hypothetical set of facts. Instead, the issue is whether the use of deadly force by Officer Hymon under the circumstances of this case violated Garner's constitutional rights. Thus, the majority's assertion that a police officer who has probable cause to seize a suspect "may not always do so by killing him," *ante*, at 9, is unexceptionable but also of little relevance to the question presented here. The same is true of the rhetorically stirring statement that "[t]he use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable." *Ante*, at 11. The question we must address is whether the Constitution allows the use of such force to apprehend a suspect who resists arrest by attempting to flee the scene of a nighttime burglary of a residence.

## II

For purposes of Fourth Amendment analysis, I agree with the Court that Officer Hymon "seized" Garner by shooting him. Whether that seizure was reasonable and therefore permitted by the Fourth Amendment requires a careful bal-

ancing of the important public interest in crime prevention and detection and the nature and quality of the intrusion upon legitimate interests of the individual. *United States* v. *Place*, 462 U. S. 696, 703 (1983). In striking this balance here, it is crucial to acknowledge that police use of deadly force to apprehend a fleeing criminal suspect falls within the "rubric of police conduct . . . necessarily [involving] swift action predicated upon the on-the-spot observations of the officer on the beat." *Terry* v. *Ohio*, 392 U. S. 1, 20 (1968). The clarity of hindsight cannot provide the standard for judging the reasonableness of police decisions made in uncertain and often dangerous circumstances. Moreover, I am far more reluctant than is the Court to conclude that the Fourth Amendment proscribes a police practice that was accepted at the time of the adoption of the Bill of Rights and has continued to receive the support of many state legislatures. Although the Court has recognized that the requirements of the Fourth Amendment must respond to the reality of social and technological change, fidelity to the notion of *constitutional*— as opposed to purely judicial—limits on governmental action requires us to impose a heavy burden on those who claim that practices accepted when the Fourth Amendment was adopted are now constitutionally impermissible. See, *e. g.*, *United States* v. *Watson*, 423 U. S. 411, 416–421 (1976); *Carroll* v. *United States*, 267 U. S. 132, 149–153 (1925). Cf. *United States* v. *Villamonte-Marquez*, 462 U. S. 579, 585 (1983) (noting "impressive historical pedigree" of statute challenged under Fourth Amendment).

The public interest involved in the use of deadly force as a last resort to apprehend a fleeing burglary suspect relates primarily to the serious nature of the crime. Household burglaries not only represent the illegal entry into a person's home, but also "pos[e] real risk of serious harm to others." *Solem* v. *Helm*, 463 U. S. 277, 315–316 (1983) (BURGER, C. J., dissenting). According to recent Department of Justice statistics, "[t]hree-fifths of all rapes in the home,

three-fifths of all home robberies, and about a third of home aggravated and simple assaults are committed by burglars." Bureau of Justice Statistics Bulletin, Household Burglary 1 (January 1985). During the period 1973–1982, 2.8 million such violent crimes were committed in the course of burglaries. *Ibid.* Victims of a forcible intrusion into their home by a nighttime prowler will find little consolation in the majority's confident assertion that "burglaries only rarely involve physical violence." *Ante*, at 21. Moreover, even if a particular burglary, when viewed in retrospect, does not involve physical harm to others, the "harsh potentialities for violence" inherent in the forced entry into a home preclude characterization of the crime as "innocuous, inconsequential, minor, or 'nonviolent.'" *Solem* v. *Helm, supra,* at 316 (BURGER, C. J., dissenting). See also Restatement of Torts § 131, Comment *g* (1934) (burglary is among felonies that normally cause or threaten death or serious bodily harm); R. Perkins & R. Boyce, Criminal Law 1110 (3d ed. 1982) (burglary is dangerous felony that creates unreasonable risk of great personal harm).

Because burglary is a serious and dangerous felony, the public interest in the prevention and detection of the crime is of compelling importance. Where a police officer has probable cause to arrest a suspected burglar, the use of deadly force as a last resort might well be the only means of apprehending the suspect. With respect to a particular burglary, subsequent investigation simply cannot represent a substitute for immediate apprehension of the criminal suspect at the scene. See President's Commission on Law Enforcement and Administration of Justice, Task Force Report: The Challenge of Crime in a Free Society 97 (1967). Indeed, the Captain of the Memphis Police Department testified that in his city, if apprehension is not immediate, it is likely that the suspect will not be caught. App. in No. 81–5605 (CA6), p. 334. Although some law enforcement agencies may choose to assume the risk that a criminal will remain at large, the

Tennessee statute reflects a legislative determination that the use of deadly force in prescribed circumstances will serve generally to protect the public. Such statutes assist the police in apprehending suspected perpetrators of serious crimes and provide notice that a lawful police order to stop and submit to arrest may not be ignored with impunity. See, e. g., *Wiley* v. *Memphis Police Department,* 548 F. 2d 1247, 1252–1253 (CA6), cert. denied, 434 U. S. 822 (1977); *Jones* v. *Marshall,* 528 F. 2d 132, 142 (CA2 1975).

The Court unconvincingly dismisses the general deterrence effects by stating that "the presently available evidence does not support [the] thesis" that the threat of force discourages escape and that "there is a substantial basis for doubting that the use of such force is an essential attribute to the arrest power in all felony cases." *Ante,* at 10, 11. There is no question that the effectiveness of police use of deadly force is arguable and that many States or individual police departments have decided not to authorize it in circumstances similar to those presented here. But it should go without saying that the effectiveness or popularity of a particular police practice does not determine its constitutionality. Cf. *Spaziano* v. *Florida,* 468 U. S. 447, 464 (1984) ("The Eighth Amendment is not violated every time a State reaches a conclusion different from a majority of its sisters over how best to administer its criminal laws"). Moreover, the fact that police conduct pursuant to a state statute is challenged on constitutional grounds does not impose a burden on the State to produce social science statistics or to dispel any possible doubts about the necessity of the conduct. This observation, I believe, has particular force where the challenged practice both predates enactment of the Bill of Rights and continues to be accepted by a substantial number of the States.

Against the strong public interests justifying the conduct at issue here must be weighed the individual interests implicated in the use of deadly force by police officers. The

majority declares that "[t]he suspect's fundamental interest in his own life need not be elaborated upon." *Ante*, at 9. This blithe assertion hardly provides an adequate substitute for the majority's failure to acknowledge the distinctive manner in which the suspect's interest in his life is even exposed to risk. For purposes of this case, we must recall that the police officer, in the course of investigating a nighttime burglary, had reasonable cause to arrest the suspect and ordered him to halt. The officer's use of force resulted because the suspected burglar refused to heed this command and the officer reasonably believed that there was no means short of firing his weapon to apprehend the suspect. Without questioning the importance of a person's interest in his life, I do not think this interest encompasses a right to flee unimpeded from the scene of a burglary. Cf. *Payton* v. *New York*, 445 U. S. 573, 617, n. 14 (1980) (WHITE, J., dissenting) ("[T]he policeman's hands should not be tied merely because of the possibility that the suspect will fail to cooperate with legitimate actions by law enforcement personnel"). The legitimate interests of the suspect in these circumstances are adequately accommodated by the Tennessee statute: to avoid the use of deadly force and the consequent risk to his life, the suspect need merely obey the valid order to halt.

A proper balancing of the interests involved suggests that use of deadly force as a last resort to apprehend a criminal suspect fleeing from the scene of a nighttime burglary is not unreasonable within the meaning of the Fourth Amendment. Admittedly, the events giving rise to this case are in retrospect deeply regrettable. No one can view the death of an unarmed and apparently nonviolent 15-year-old without sorrow, much less disapproval. Nonetheless, the reasonableness of Officer Hymon's conduct for purposes of the Fourth Amendment cannot be evaluated by what later appears to have been a preferable course of police action. The officer pursued a suspect in the darkened backyard of a house that from all indications had just been burglarized. The

police officer was not certain whether the suspect was alone or unarmed; nor did he know what had transpired inside the house. He ordered the suspect to halt, and when the suspect refused to obey and attempted to flee into the night, the officer fired his weapon to prevent escape. The reasonableness of this action for purposes of the Fourth Amendment is not determined by the unfortunate nature of this particular case; instead, the question is whether it is constitutionally impermissible for police officers, as a last resort, to shoot a burglary suspect fleeing the scene of the crime.

Because I reject the Fourth Amendment reasoning of the majority and the Court of Appeals, I briefly note that no other constitutional provision supports the decision below. In addition to his Fourth Amendment claim, appellee-respondent also alleged violations of due process, the Sixth Amendment right to trial by jury, and the Eighth Amendment proscription of cruel and unusual punishment. These arguments were rejected by the District Court and, except for the due process claim, not addressed by the Court of Appeals. With respect to due process, the Court of Appeals reasoned that statutes affecting the fundamental interest in life must be "narrowly drawn to express only the legitimate state interests at stake." 710 F. 2d, at 245. The Court of Appeals concluded that a statute allowing police use of deadly force is narrowly drawn and therefore constitutional only if the use of such force is limited to situations in which the suspect poses an immediate threat to others. *Id.*, at 246–247. Whatever the validity of Tennessee's statute in other contexts, I cannot agree that its application in this case resulted in a deprivation "without due process of law." Cf. *Baker* v. *McCollan*, 443 U. S. 137, 144–145 (1979). Nor do I believe that a criminal suspect who is shot while trying to avoid apprehension has a cognizable claim of a deprivation of his Sixth Amendment right to trial by jury. See *Cunningham* v. *Ellington*, 323 F. Supp. 1072, 1075–1076 (WD Tenn. 1971) (three-judge court). Finally, because there is no indication that the use

of deadly force was intended to punish rather than to capture the suspect, there is no valid claim under the Eighth Amendment. See *Bell* v. *Wolfish*, 441 U. S. 520, 538–539 (1979). Accordingly, I conclude that the District Court properly entered judgment against appellee-respondent, and I would reverse the decision of the Court of Appeals.

## III

Even if I agreed that the Fourth Amendment was violated under the circumstances of this case, I would be unable to join the Court's opinion. The Court holds that deadly force may be used only if the suspect "threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm." *Ante*, at 11. The Court ignores the more general implications of its reasoning. Relying on the Fourth Amendment, the majority asserts that it is constitutionally unreasonable to *use* deadly force against fleeing criminal suspects who do not appear to pose a threat of serious physical harm to others. *Ibid.* By declining to limit its holding to the use of firearms, the Court unnecessarily implies that the Fourth Amendment constrains the use of any police practice that is potentially lethal, no matter how remote the risk. Cf. *Los Angeles* v. *Lyons*, 461 U. S. 95 (1983).

Although it is unclear from the language of the opinion, I assume that the majority intends the word "use" to include only those circumstances in which the suspect is actually apprehended. Absent apprehension of the suspect, there is no "seizure" for Fourth Amendment purposes. I doubt that the Court intends to allow criminal suspects who successfully escape to return later with § 1983 claims against officers who used, albeit unsuccessfully, deadly force in their futile attempt to capture the fleeing suspect. The Court's opinion, despite its broad language, actually decides only that the

shooting of a fleeing burglary suspect who was in fact neither armed nor dangerous can support a § 1983 action.

The Court's silence on critical factors in the decision to use deadly force simply invites second-guessing of difficult police decisions that must be made quickly in the most trying of circumstances. Cf. *Payton* v. *New York*, 445 U. S., at 619 (WHITE, J., dissenting). Police are given no guidance for determining which objects, among an array of potentially lethal weapons ranging from guns to knives to baseball bats to rope, will justify the use of deadly force. The Court also declines to outline the additional factors necessary to provide "probable cause" for believing that a suspect "poses a significant threat of death or serious physical injury," *ante*, at 3, when the officer has probable cause to arrest and the suspect refuses to obey an order to halt. But even if it were appropriate in this case to limit the use of deadly force to that ambiguous class of suspects, I believe the class should include nighttime residential burglars who resist arrest by attempting to flee the scene of the crime. We can expect an escalating volume of litigation as the lower courts struggle to determine if a police officer's split-second decision to shoot was justified by the danger posed by a particular object and other facts related to the crime. Thus, the majority opinion portends a burgeoning area of Fourth Amendment doctrine concerning the circumstances in which police officers can reasonably employ deadly force.

## IV

The Court's opinion sweeps broadly to adopt an entirely new standard for the constitutionality of the use of deadly force to apprehend fleeing felons. Thus, the Court "lightly brushe[s] aside," *Payton* v. *New York*, *supra*, at 600, a longstanding police practice that predates the Fourth Amendment and continues to receive the approval of nearly half of the state legislatures. I cannot accept the majority's creation of a constitutional right to flight for burglary sus-

pects seeking to avoid capture at the scene of the crime. Whatever the constitutional limits on police use of deadly force in order to apprehend a fleeing felon, I do not believe they are exceeded in a case in which a police officer has probable cause to arrest a suspect at the scene of a residential burglary, orders the suspect to halt, and then fires his weapon as a last resort to prevent the suspect's escape into the night.   I respectfully dissent.