Candace LEHMAN;  Estate of Joshua Lehman;  Linda Blount;  Camilia Lehman, Plaintiffs–Appellees,

v.

Tom ROBINSON;  Robert Robinson, Defendants–Appellants.

No. 05–15636.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 16, 2007.

Filed April 16, 2007.

David R. Houston, Esq., Jeffrey A. Dickerson, Esq., Reno, NV, for Plaintiffs–Appellees.

Creighton C. Skau, Esq., Reno, NV, for Defendants–Appellants.

Before: WALLACE, CUDAHY *, and McKEOWN, Circuit Judges.

### MEMORANDUM **

In this interlocutory appeal, defendant police officers Tom Robinson and Robert Tygard challenge the district court's denial of their motion for summary judgment based on qualified immunity for the shooting death of Josha Lehman. We review the district court's denial of qualified immunity *de novo*, construing all disputed facts in the light most favorable to the party asserting injury, and we affirm. *See, e.g., Beier v. City of Lewiston*, 354 F.3d 1058, 1063 (9th Cir.2004). Since the parties are familiar with the facts, we will not recite them here except as necessary to explain our reasoning.

Government officials enjoy qualified immunity from civil damages unless their conduct violates "clearly established constitutional or statutory rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). In analyzing whether a particular official is entitled to qualified immunity, we must address two questions, in a particular order. First, we consider whether the facts alleged show the officer's conduct violated a constitutional right. *See Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Second, and only if a constitutional right was violated, we consider whether the right was clearly established such that a reasonable officer would believe the alleged conduct was unlawful. *See id.* at 202, 121 S.Ct. 2151. "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

The Fourth Amendment prohibits police from deploying lethal force against a suspect who "poses no immediate threat to the officer and no threat to others...." *Tennessee v. Garner*, 471 U.S. 1, 11, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). The Supreme Court has held that it is unreasonable to "seize an unarmed, nondangerous suspect by shooting him dead." *Id.* However, "[w]here the officer has probable cause to believe that the suspect poses a

* The Honorable Richard D. Cudahy, Senior United States Circuit Judge for the Seventh Circuit, sitting by designation.

** This disposition is not appropriate for publication and is not precedent except as provided by 9th Cir. R. 36–3.

threat of serious physical harm, either to the officer or others, it is not constitutionally unreasonable to prevent escape by using deadly force." *Id.* We analyze the facts bearing on the threat posed by Lehman with particular attention to "the severity of the crime at issue, whether the suspect pose[d] an immediate threat to the safety of the officers or others, and whether he ... actively resist[ed] arrest or attempt[ed] to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989).

Construed in the light most favorable to Lehman, the facts alleged are that defendant officers Robinson and Tygard shot and killed Lehman as he sat in his car, with all the tires shot out, surrounded by at least ten armed police officers and numerous police vehicles. Other officers on the scene had instructed all present to hold their fire, and defendants knew Lehman was not armed with a gun. Defendant Tygard testified that he knew Lehman did not have a gun, but only a pocket knife. Another officer present described the knife as "a little folding knife."

Several other officers present testified that they had Lehman "boxed in" when he was shot. One officer said: "[m]y immediate response was just to contain the situation, which we did." When viewed in the light most favorable to Lehman, the record suggests that Lehman had no readily available avenue of escape and was contained.

Lehman was not suspected or accused of any crime. When Officer Klier was asked "the purpose of trying to get him out of the vehicle" Klier stated "we were responding to ... a suicidal subject." Klier was asked: "Was the point of trying to exit him from the vehicle to talk to him about trying not to kill himself?" Klier responded: "Exactly."

When told to drop his knife and get back in his pickup truck, Lehman partially obeyed, by reentering the vehicle, but not dropping the knife. One of the officers present testified that the negotiating officer "was making progress in talking Lehman into giving himself up." Another officer testified: "communications ... seemed to me to be working." Yet another officer stated: "I could tell there was no need for any other gunfire.... I didn't want to see that kid get killed."

At the point of the shooting, Lehman had been pepper sprayed and tasered, and at least partially subdued. The area had also been cleared of pedestrians. Officer Slobe testified: "The situation that we had there with the negotiations going on, I felt that it could be—the whole thing could be secured and the suspect taken into custody without the use of force." Officer Giurlani stated: "I was standing right there. I could tell that there was no need for any other gunfire."

In light of all of the facts, construed in the light most favorable to Lehman, when defendants shot and killed Lehman the situation did not require lethal force as confirmed by the testimony of multiple officers on the scene. Therefore, we conclude that defendants' use of force against Lehman was unreasonable and violated his Fourth Amendment right to be free of lethal force unless others' lives and safety are under immediate threat.

In accordance with the second step of the *Saucier* framework, we consider whether the Fourth Amendment right prohibiting the use of deadly force except when the lives and safety of others are seriously imperiled was clearly established in 2002 when defendants shot and killed Lehman. As early as 1996, this court assumed without further comment that "the law governing when an officer may use deadly force against an unarmed fleeing suspect was clearly established...." *Acosta v. San Francisco*, 83 F.3d 1143,

1147 (9th Cir.1996) (citation omitted). "[W]here the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so." *Garner,* 471 U.S. at 11, 105 S.Ct. 1694. In 1996, in *Acosta,* this Court held that an officer "shooting at the driver of a slow-moving car" was not entitled to qualified immunity, especially when "a reasonable officer ... would have recognized that he could avoid being injured by simply stepping to the side." *Acosta,* 83 F.3d at 1146–47.

In *Deorle v. Rutherford,* 272 F.3d 1272, 1285–86 (9th Cir.2001), we held that even in a non-lethal police shooting under circumstances otherwise similar to those here, the officers were not entitled to qualified immunity. As in Lehman's case, the shooting in *Deorle* occurred in the presence of a large number of police officers, without any "warning of the imminent use of such a significant degree of force," and was directed at a mentally disturbed individual who had "committed no serious offense...." *Id.*

Although we have recognized that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving...." *Billington v. Smith,* 292 F.3d 1177, 1184 (9th Cir.2002) (quoting *Graham v. Connor,* 490 U.S. at 396, 109 S.Ct. 1865), this case is unlike those in which the lone officer is confronted with a violent fleeing felon and is forced to make an exigent split second judgment call. For example, in *Billington,* unlike here, the officer shot the subject when the officer was "locked in hand-to-hand combat and losing.... [The subject] actively, violently, and successfully resisted arrest and physically attacked [the officer] and tried to turn [his] gun against him.... [The subject] was trying to get the detective's gun, and he was getting the upper hand." *Id.* at 1185. In

contrast, the record here does not reflect a risk of harm to the officers or others commensurate to the risk of harm in cases in which the officers deploying lethal force have been granted qualified immunity.

The cases cited by the defendant officers are all distinguishable in this respect. Unlike the suspect in *Smith v. Freland,* 954 F.2d 343, 344 (6th Cir.1992), who led police on a chase at speeds in excess of ninety miles per hour and who police believed may have been armed with a gun, Lehman could not travel anywhere quickly, as any reasonable officer could tell from the state of Lehman's completely flattened tires, and the officers had engaged in sufficient verbal negotiations to discern Lehman was armed only with a small knife. The district court distinguished in detail *Brosseau v. Haugen,* 543 U.S. 194, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004), another case on which defendants rely; we agree with the district court's analysis and do not repeat it here.

The district court's denial of qualified immunity to defendants Robinson and Tygard is AFFIRMED.