Robert DAVIS, Plaintiff,

v.

David LITTLE, Louis Scozzafava, Defendants.

Civ. No. N–82–369 (TPS).

United States District Court,
D. Connecticut.

Oct. 7, 1987.

Sue Wise, Williams & Wise, New Haven, Conn., for plaintiff.

Emmet P. Nichols, Feeley, Nichols, Elliott, Chase & McDermott, P.C., Waterbury, Conn., for defendants.

## MEMORANDUM OF DECISION

THOMAS P. SMITH, United States Magistrate.

This action was tried to the court. Fifteen witnesses testified. Based on the documentary evidence and credible testimony, judgment shall enter for plaintiff against defendant Little only.[1]

### Findings of Fact

1. Nine-thirty a.m., April 17, 1981, found Robert B. Davis, a professional boxer, on his way to Caldor's in Waterbury, Connecticut, where he worked part-time as a store detective for the security department. But Davis was never to make it to work that day for, as he drove through the intersection of North Walnut and Division Streets, "his past caught up with his future" (Thomas D. Williams, "Ex-Convict's

---

1. Pursuant to 28 U.S.C. § 636(c) the parties' right to appellate review is in the United States Court of Appeals for the Second Circuit.

Hopes Suffer Knockout Blow," Hartford Courant, August 21, 1981, Plaintiff's Exhibit 38). Waterbury police officer Robert Cleveland stopped his car, accused him of having run a stop sign at the intersection of East Farm and Division Streets, and asked for his license and registration. These Davis produced, along with his Caldor's employee identification card. Thus began the strange chain of events which was to curtail Davis's promising boxing career (Davis, Cleveland).

2. The driver's license, issued in North Carolina, bore the name Robert B. Davison, whereas the Connecticut registration was in the name of Robert B. Davis. In addition, Officer Cleveland was under the impression that the documents bore different birth dates. His suspicions aroused, Cleveland returned to his cruiser and requested that the dispatcher run an NCIC check on Davis and his automobile. Davis waited in the cruiser. When the NCIC came out negative, Cleveland told Davis he was free to go (Davis, Cleveland).

3. At the time of the stop, there was another person in the car with Davis. There was conflicting testimony at trial as to this person's gender and identity; Cleveland claimed that Davis's passenger was a woman, and Davis claimed that his passenger was one Michael Eason, who testified at trial. The court need not reconcile these conflicting accounts, for the identity of Davis's passenger is irrelevant to the issue whether defendants unlawfully shot plaintiff.

4. When Cleveland told him that he could leave, Davis continued north on North Walnut, then turned left onto Branch Street. As his car disappeared around the bend, Cleveland heard a revised radio transmission from dispatcher Ralph Belvedere. This message alerted its audience to a "hit" on the NCIC check and, depending upon which officer did the listening, that Davis was "an escaped felon from a correctional institution in North Carolina," "an escapee from North Carolina," or "an escaped prisoner" (Davis, Cleveland, Andrews, Little, Scozzafava).

5. Upon hearing of the NCIC "hit" Officer Cleveland drove quickly to Branch Street. Plaintiff testified that Cleveland pulled him over about forty to fifty feet from the corner; Cleveland testified that Davis's car was already pulled over and parked at the curb on the north side of Branch. In any event, Cleveland parked and approached Davis, who was now alone. He told Davis there had been a problem and he needed to see Davis's license and registration once more. Davis complied with this request, submitted to a pat-down which disclosed no weapons, and willingly took a seat in the back of Cleveland's cruiser. Cleveland testified that he placed Davis under arrest after frisking him (Davis, Cleveland).

6. Here the accounts of the various witnesses diverged widely. Officer Cleveland stated that he sat in the front seat behind the steering wheel, his body twisted so that he could observe and speak to Davis who sat in back; that there were many radio dispatches regarding Davis and his status as an escaped felon; that Davis heard those dispatches and, increasingly anxious, began to inch his way to the rear passenger side door; that he grabbed Davis, who struck him in the head three to five times with his fist; that while he lay dazed, Davis left the car; that once he recovered his equilibrium he attempted to chase Davis on foot but could not catch Davis, who ran much faster than he down Branch to North Walnut Street.

Lieutenant Andrews testified that upon hearing of the NCIC "hit," he drove to Branch Street to back up Cleveland and arrived to observe struggling in the car; that as he approached the rear passenger side door Davis emerged and pushed him backward with his hand, causing him to fall down onto his derriere; that he ran toward North Walnut Street after Davis, whom he was unable to catch on foot; that he called in a description of Davis on his hand-held radio; that just before he rounded the corner onto North Walnut he heard Little and Scozzafava warn plaintiff to halt and fire their guns.

Plaintiff maintained that he did not hit Cleveland; that Andrews opened the rear passenger side door of Cleveland's cruiser and attempted to pull him out of the car; that he then eluded Andrews' grasp and slid out of the cruiser; that he did not run but rather walked backwards away from the scene; that as he backed away down Branch towards North Walnut Street he repeatedly told Cleveland and Andrews there had been a mistake and he was the wrong man (Davis, Cleveland, Andrews).

The court is hard pressed to choose between the versions offered by Cleveland and Davis, both of whom are very persuasive and credible witnesses. But it need not credit either man's testimony above that of the other, for the court finds that Little and Scozzafava were unaware of the incident at the time they fired their guns. Therefore, they could not and did not base their actions on this incident.

7. In the meantime dispatcher Belvedere had sent Officers Davis Little and Louis Scozzafava to back Cleveland. Their brief drive to North Walnut and Branch Streets was punctuated by several radio transmissions which gave a physical description of the NCIC subject, referred to him as an escaped felon, and, finally, informed him that he had "escaped" and was running. They testified that within seconds of hearing this last message and when they were midway between Division and Branch Streets on North Walnut, they spotted Davis. Immediately identifying him as fitting the description given over the radio, they stopped their patrol car near the center of the road and emerged from the car, guns drawn. They rushed to the front of the car—Little on the driver and Scozzafava on the passenger side—and crouched, service revolvers trained on Davis. They claimed to have warned him to stop. They claimed too that Davis rounded the corner wide and headed straight for them, punched Little and shoved Scozzafava aside, and ran around the far (i.e. passenger) side towards the rear of the car. Like Cleveland and Andrews, they testified Davis ran rapidly.

But Davis testified that as he walked quickly around the corner onto North Walnut, Little and Scozzafava ran at him with their guns drawn. They gave no verbal warning that they would shoot. His only thought was to get away from them, so he did some "fancy footwork" which "faked them off their feet": they lost their balance and fell into each other. As they lumbered to their feet, Davis rounded the far side of the cruiser.

The court finds Davis's testimony regarding the encounter by far more credible than the officers' version. But even if the court were to accept the officers' account as true, one thing is certain: Little and Scozzafava, by their own admission, saw that Davis was unarmed.

The three parties agree that as Davis came into view around the rear driver's side of the car, Scozzafava and Little fired their guns. Scozzafava fired a shot into the air. But Little aimed at Davis and emptied his gun, hitting Davis with four of the eight bullets. Davis fell at the northwest corner of North Walnut and Division Streets (Davis, Little, Scozzafava).

8. At the moment Little shot Davis, Little and Scozzafava knew (a) he fit the description of the subject of the NCIC "hit"; (b) he was an escaped felon; (c) he had been in Cleveland's custody; (d) he had fled from Cleveland's custody; (e) there had been a few seconds' gap in radio transmissions from Cleveland; (f) Davis was not carrying a weapon; (g) Davis had not used or threatened to use deadly force on either of them; (h) Davis was not on the verge of using deadly force on third parties; (i) Davis was attempting at all times to run away from them to avoid arrest (Little, Scozzafava).

9. At the moment Little shot Davis, Little and Scozzafava did not know (a) the specific felony Davis had been convicted of committing (i.e. whether that conviction had been for a *violent* or non-violent crime); (b) whether Davis had used *any*, let alone *deadly*, force on Officer Cleveland; (c) that Officer Andrews had arrived to assist Cleveland; (d) whether Davis used *any*, let alone *deadly*, force on Andrews;

(e) that Davis was a professional boxer (Little, Scozzafava).

10. Nor did Little and Scozzafava know at the moment Little shot Davis (1) Davis's moniker in some boxing circles was "Doctor Death"; (2) Davis, a part-time Caldor employee, drove a Lincoln Continental Town Car; (3) Davis was not married but had some years earlier fathered a child, and his girlfriend (now wife) Donna was pregnant with his child; (4) Davis allegedly failed to report his boxing earnings to the Internal Revenue Service; (5) Davis had indicated on his application for employment at Caldor's that he had never been convicted of a crime; (6) while in prison in South Carolina Davis had boxed under the name "Clarence Feaster"; (7) there was a discrepancy in the name on Davis's driver's license and that on his motor vehicle registration.

After careful consideration of this information, the court acknowledges its presence in the record but declines to draw from it any inferences unfavorable to plaintiff, for several reasons. First, numbers 1, 2 and 3 are wholly irrelevant to the present issue whether Little and Scozzafava unlawfully shot plaintiff or to Davis's credibility. Second, assuming numbers 4, 5, 6, and 7 do bear on his credibility, Davis's sincere and credible explanations[2] satisfy the court and, more important, these "facts" are irrelevant to the question whether Little shot plaintiff unlawfully.

11. Officer Scozzafava, who shot not at Davis but into the air, did not violate Davis's rights under the Fourth Amendment, for he seized nothing, and did not act in concert with his partner Little. But Officer Little did violate those rights for, knowing only that Davis was a fleeing, unarmed, escaped felon attempting to avoid arrest, he used deadly force for the sole purpose of thwarting his escape.

12. Officers Cleveland, Andrews, Little, and Scozzafava claim Davis physically attacked them. Cleveland stated Davis punched him with his fist, Andrews that he pushed him with his hands, Little that he hit him with his hand, and Scozzafava that he shoved him with his body. None of the officers claim Davis used deadly force on them. On the contrary, they testified that he was not armed and that he "attacked" them with his body or a part thereof. Moreover, none of them claims to have feared infliction of serious bodily harm at Davis's hands.

The court believes that Davis, in his panic, probably did hit Cleveland. It is not convinced that he assaulted any of the others, however. Even supposing that these alleged assaults did take place, by the officers' own admission, Davis had no weapon and neither used nor threatened to use deadly force on any of them (Cleveland, Andrews, Little, Scozzafava).

13. Officer Little did not shoot at Davis as Davis ran towards him and his partner, although logically this would seem to be the point at which he and Scozzafava should have imagined themselves most endangered. Rather, he waited until plaintiff was running away from him and had his back turned to him before he shot (Davis, Little).

14. The court need not decide whether, as Davis alleges, Little ran up to him after the shooting, pulled his head back, held his gun to Davis's head, and called Davis a "motherfucking nigger," for the court finds that the shooting, though an egregious violation of Davis's rights, was not racially motivated.

15. Two of Little's bullets struck Davis in the buttocks. Another grazed his shoul-

---

**2.** Davis testified (1) he did not report his boxing income to the Internal Revenue Service because his promoters never provided him with the appropriate tax form and his tax preparer did not notify him he should; (2) his understanding was that because he had *pleaded* guilty he had not been "convicted" of a crime; (3) the South Carolina authorities had mistakenly arrested him under the name "Clarence Feaster" and, despite his informing them of his true name, would not permit him to box under any but the name he had been arrested under; (4) his father had inadvertently or mistakenly given plaintiff's last name as "Davison" on his birth certificate, which document had to be produced for issuance of a Connecticut operator's license but not for a Connecticut motor vehicle registration.

der. The last shattered his left elbow, destroying or damaging 25 to 30% of the articular surface of its joint. For many months after his discharge from the hospital, Davis was in constant pain and could not attend to his personal needs without the help of Donna Davis and other relatives. Despite extensive physical therapy and training he did not regain full use of his left arm. It was not until two years after the shooting that he returned to his job at Caldor's. In May 1982 he underwent a third surgical procedure which increased somewhat his range of motion but failed to restore extension and flexion. His arm "locks and he can neither straighten it, nor ... touch his left hand to his left shoulder" (Plaintiff's Trial Memorandum at 17). His surgeon, Dr. Charles Beaumont, testified that the pain he feels will increase with age and that Davis has significant scarring and ossification along the interior aspect of the elbow. Moreover, he stated that Davis has a 25% permanent partial disability of his left upper extremity. Thus, permanently bereft of his crucial left jab, Davis can no longer box (Beaumont, Buckley).

16. F. Mac Buckley—a lawyer and boxing expert who has fought on both amateur and professional levels; coached United States junior olympic amateur fighters; trained, managed, and promoted many world-ranked boxers including Marlon Starling; acted as boxing advisor to the Hartford Civic Center, head of the Connecticut Amateur Boxing Association, and consultant to various boxing publications—testified that Davis, who had "excellent amateur credentials," was "a main event fighter" at the time Little shot him. He was not an "opponent" (one who travels out of town and loses to a big name fighter). Nor was he someone "on the way down." Rather, he was a "boxer-puncher" and "better than average defensive fighter" who "might have become a world ranked fighter" had Little not maimed him. At the very least he could have made a "decent living as a professional boxer" (Tr. 12/16/85 at 129–146). He had fought twelve or thirteen professional bouts and won six or seven; this was no mean feat, for Davis fought top-ranked boxers more experienced than himself, admirably holding his own with them and sometimes, as in the case of thirteen-ranked "Irish" Teddy Mann, beating them soundly.

Davis earned between $300 and $2500 per match. According to Buckley, he was in good shape and could have continued to box until he turned 33 or 34, or about five more years. His relatively late start on the professional level was made up for by the fact that his incarceration while an amateur shielded him from the dangers and hardships of street life.

Buckley estimated Davis's boxing income would have been between $15,000 and $30,-000 per year for six to eight fights per year, excluding televised bouts. In addition, work as a sparring partner could bring $250 to $400 per week or $50 to $75 per day. Further, the boxer's flexible schedule would have enabled him to take on a non-boxing job as well. And, once he had retired as a "main event" boxer he could earn perhaps $10,000–$20,000 per year as a professional sparrer (Buckley).

17. James Peterson, Davis's former manager, testified that Davis was a hardworking and aggressive boxer. George Butler, former New England featherweight champion and Davis's trainer, attested to Davis's "determination," "potential," "alertness," and "aggressiveness," the "conscientious" approach he took to training, and his "dedication" to boxing. Of the more than one hundred fighters Butler had trained, Davis was "the most disciplined" he had ever had (Tr. 12/12/85 at 212–215) (Peterson, Butler).

18. The record establishes that Davis was a talented, industrious, determined fighter who would have made a good yearly wage as a professional "main event" fighter had his career not been cut short by Little's bullets.

## CONCLUSIONS OF LAW

The voluminous record here belies the simple and straightforward nature of the issue it presents to the court: was Officer

Little's [3] seizure of plaintiff by use of deadly force reasonable in the circumstances of this case? Put another way, what did Little know, and when did he know it?

It is beyond dispute that "apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." *See Tennessee v. Garner,* 471 U.S. 1, 7, 105 S.Ct. 1694, 1699, 85 L.Ed.2d 1 (1985) (*"Garner"*). In *Garner,* the Supreme Court held that the use of deadly force to thwart the escape of an apparently unarmed suspected felon is only reasonable if (1) it is necessary to prevent escape *and* (2) the police officer has probable cause to believe the suspect poses a significant threat of death or serious injury to h/er or to third persons, *id.* at 3, 105 S.Ct. at 1697, *and* (3) where feasible the officer warns the suspect that s/he might use deadly force. *Id.* at 11, 105 S.Ct. at 1701. The Second Circuit reads *Garner* to "bar[ ] the deliberate use of force to seize an unarmed, fleeing, suspected felon." *Dodd v. City of Norwich,* 827 F.2d 1, 7 (1987). Yet this is exactly what Officer Little did.

Little maintains in effect that he was entitled to use deadly force on Davis, whom he knew to be unarmed, because he and Scozzafava knew plaintiff was an escaped felon and because there had been a momentary gap in radio contact with Officer Cleveland, followed by "somebody" shouting "he's running up Branch Street" (Tr. 12/5/85 at 12). The court has found Davis did not assault Little and Scozzafava as they claim but rather performed an "Ali shuffle" which caused them to lose their footing and stumble over each other. Both Little and Scozzafava conceded they did not know what, if anything, had befallen Cleveland and were unaware of Officer Andrews' appearance and involvement.

That the dispatcher had described Davis as an escaped felon, or words to that effect, did not necessarily mean that he had committed a violent or dangerous felony. For all Little knew, Davis's might have been a conviction for embezzlement or passing bad checks. Even if he had committed a violent felony in the past, Little and Scozzafava could clearly see that he was without a weapon as he ran by them. The few seconds' loss of radio contact with Cleveland likewise was susceptible of various interpretations but Little, armed with service revolver and sheer conjecture, leapt to the ultimate conclusion: that Davis had used deadly force to subdue Cleveland. Such wild surmise does not probable cause make.

Defendants' own testimony makes plain the unreasonableness of Little's disproportionate use of force against Davis. Little "had no articulable basis to think [Davis] was armed," *Garner, supra,* 417 U.S. at 20, 105 S.Ct. at 1706. Indeed, he stated at trial Davis was unarmed. Nor had he any reasonable basis to believe Davis "posed a threat" to him or to others. *Id.* And, as the court has noted (Finding 12), even if Davis had assaulted Little and Scozzafava, he did so without inflicting or intending to inflict serious bodily harm on them. Thus, the scenario most favorable to defendants contains arguably only one of the three elements *Garner* demands: that deadly force be necessary to prevent escape. At best, Little impermissibly used deadly force for that reason alone.

In short, Little shot first and looked for answers later. But his answers do not absolve him of responsibility for his wholly irresponsible, unnecessary, and unreasonable use of deadly force on the obviously unarmed, obviously fleeing Mr. Davis. Even the benefit of hindsight fails to exonerate him, for it reveals not that Little had probable cause to shoot Davis, but rather, what little Little knew.

■ The court has given careful attention to Mr. Buckley's extraordinarily impressive expert testimony regarding plaintiff's lost boxing wages and is satisfied that his estimates are reasonable and accurate. Based on those estimates, and considering plaintiff's age and physical condition as well as his determination to succeed in and devotion to boxing, the court finds

---

**3.** Because the court has found Scozzafava neither unlawfully seized plaintiff himself nor aided Little's illicit seizure of plaintiff, its discussion here pertains to Little alone.

that plaintiff could have fought as a "main event" fighter for five more years at $22,-500.00 [4] per year, for a total of $112,500.00. The court also finds that upon his retirement from "main event" fighting, he could have worked as a sparring partner [5] for five more years at $15,000 [6] per year, for a total of $75,000.00. In arriving at damages, the court has taken into account the possibility that the purported fits of temper and "memory losses" defendants' counsel maintained Davis suffered from would have shortened his career.

█ Plaintiff seeks damages of $32,-000.00 for two years' lost wages at Caldor's. The court finds that he has clearly proved himself entitled to damages for both years immediately following the shooting.

The medical expenses for which plaintiff requests compensation comprise several bills: $2,370.85 to Waterbury Hospital, $6,851.75 to St. Mary's Hospital, $90.00 to Dr. Charles Beaumont, and $234.35 to Naugatuck Valley Radiology, for a total of $9746.95. Plaintiff is entitled to reimbursement of the full amount. Defendants attempted to establish at trial that either the State of Connecticut or the City of Waterbury, or both, paid Davis's medical bills. That may well be, but it does not alter the fact of Davis's entitlement. If Davis owes money to the State of Connecticut or to the City of Waterbury, the court is certain that they will attempt to get it from him as soon as they learn he has it.

Plaintiff has requested damages for pain and suffering for (a) his initial incapacitation of 180 days, at $50.00 per day or $9,000.00 and (b) his incapacitation of 100 days following the second surgery, at $50.00 per day or $5,000.00. The record

makes plain the reasonableness of this request, which the court hereby grants.

Finally, for the 25% permanent partial disability of his left arm, the court awards plaintiff $120,000.00.[7]

In light of the foregoing, judgment shall enter for plaintiff against defendant Little, who shall pay to plaintiff damages in the amount of $347,046.95.

---

4. This figure represents the exact mid-point of the potential annual salary range Buckley cited for "main event" fighting.

5. This portion of the award is *not* intended to compensate plaintiff for wages he would have earned as a part-time sparring partner *during* his "main event" years. Although Mr. Buckley indicated Davis could have earned as much as $400.00 per week or $75.00 per day as a sparring partner during that time, he was unable to

"annualize" that figure. Unfortunately, therefore, damages for this loss are wholly speculative and so cannot be awarded.

6. This too represents the mid-point of the annual salary range Buckley cited for this activity.

7. Because the court has found that the shooting was neither malicious nor racially motivated, it does not award plaintiff punitive damages.