Susan **LEGHART**, as Representative
of Ronald Leghart, Deceased,
and Mellisa S. Engler

v.

**OFFICER WESLEY HAUK**, Individually,
and in his Official Capacity as a Police
Officer with the El Paso Police Depart-
ment; Russ Leach, Individually, and in
his Official Capacity as the Chief of
Police for the City of El Paso Police
Department; and the City of El Paso,
Texas.

No. EP–98–CA–235–DB.

United States District Court,
W.D. Texas,
El Paso Division.

Nov. 23, 1998.

Brad D. Hall, Albaquerque, NM, Christopher A. Antcliff, El Paso, TX, for Plaintiffs.

Randolph H. Grambling, Duane A. Baker, Maria Guadalupe Martinez, Assitant City Attorney, El Paso, TX, for Defendants.

## *MEMORANDUM OPINION AND ORDER*

BRIONES, District Judge.

On this day, the Court considered Defendant Wesley Hauk's Motion to Dismiss and for Summary Judgment filed on July 24, 1998, in the above-captioned cause. On October 2, 1998, Plaintiffs filed their Response. On October 7, 1998, at the request of the Court, Defendant filed his Reply to which Plaintiffs filed their Sur–Reply two days later. On October 14, 1998, Defendant filed his Sur–Reply to Plaintiffs' Sur–Reply. After due consideration, the Court is of the opinion that Defendant's Motion should be denied for the reasons set forth below.

### Facts

This cause of action arises out of an incident alleged to have occurred on March 30, 1998, in El Paso, Texas. On that date, at approximately 4:45 p.m., Defendant Wesley Hauk ("Hauk") and his partner Michael Lee ("Lee"), both employed as officers with the El Paso Police Department, responded to a complaint involving an alleged vehicular theft and domestic dispute between Plaintiff Susan Leghart ("Plaintiff") and her ex-husband Ronald Leghart ("Leghart"). Having been advised by police dispatch that Leghart was a "code 10"[1] subject, Hauk and his partner proceeded to Plaintiff's residence to investigate the matter.

Upon their arrival, Plaintiff informed the officers that when she came home from work, she found Leghart "shooting-up" with cocaine and that an argument eventually ensued between the two regarding his cocaine habit.[2] Plaintiff further stated that, during the course of the argument, Leghart grabbed her keys, stole her car, and nearly ran her over twice—once while backing out of the driveway of Plaintiff's home and once while driving away. Plaintiff and other anonymous persons on the scene then proceeded to provide officer Hauk with a description[3] of Leg-

---

1. In general, a "code 10" issues to alert an officer to a subject's potential for violence, based on the subject's prior experiences with the police. Here, it is uncontested that a "code 10" was issued to inform officers Hauk and Lee that Leghart was possibly armed, might resist arrest, and was under the influence of drugs.

2. Despite their divorce, Plaintiff and Leghart lived together continuously for seventeen years prior to March 30, 1998.

3. Plaintiff claims she informed Hauk that Leghart wore a prosthetic leg, and as such, needed to push a certain button in order to extricate himself from her vehicle. Plaintiff avers that she provided the officers with this information because she "wanted to make sure that they knew if [Leghart] reached down, that [he] wasn't [reaching] for a weapon or anything."

hart and his probable whereabouts and to explain that Leghart was suicidal and that he would do anything to keep from having to return to prison.[4] Hauk was informed that Leghart could likely be found at a particular automated teller machine around midnight to make a withdrawal of his Social Security check, which was scheduled to be deposited there. He was further informed that at this point. Leghart had probably parked Plaintiff's vehicle behind a nearby 7–Eleven convenience store and gone inside a nearby bar for a few drinks. Finally, Plaintiff indicated to Hauk that in any event. Leghart could not have gotten very far as the vehicle he was driving was "running on fumes." At some point during this initial encounter at Plaintiff's residence, other El Paso police officers had arrived, had spoken with Lee and had decided to look for Leghart.

Based on the information received by them at the scene, Hauk and Lee eventually proceeded to the nearby 7–Eleven described by Plaintiff. When they arrived, they spotted a white Mazda Protégé ("Mazda") matching the description and bearing the same license plate number as the one Plaintiff reported stolen. Having also spotted a male, which later turned out to be Leghart, standing between the Mazda and a Chevrolet Celebrity ("Celebrity") parked directly to the north, officer Lee "strategically parked the patrol car facing at an angle at the front right corner of the suspected stolen vehicle" and called for backup. Noticing Leghart quickly enter the Mazda, and suspecting that he might be trying to escape, Hauk decided to try to make contact with Leghart. While walking to the driver's side door of the Mazda with his revolver in hand and concealed behind his right leg, Hauk ordered Leghart to shut off the engine and exit the vehicle. Beyond this point, the only live eyewitnesses to the ensuing encounter are officers Hauk and Lee.

According to Hauk's affidavit testimony, Leghart, after refusing to comply with his request to exit the vehicle and after stating, in addition to various other expletives, that he "did not do a fucking thing," "turn[ed] the steering wheel hard to the left, [and] 'gunn[ed]' the engine." Thus, finding himself cornered between the Mazda and the Celebrity and fearing that Leghart was going "to try to squash [him]" between the two, Hauk fired two shots from his revolver into the left front tire of the Mazda, while at the same time "tr[ied] to get away from the moving vehicle by stepping toward[ ] the rear of [it]."[5] Noticing that the vehicle did not immediately stop, Hauk, after going into what he describes as "automatic mode" and allegedly not realizing that Lee had pinned the Mazda against the Celebrity with his patrol car, fired five more shots into the driver's compartment of the Mazda, killing Leghart.

On July 8 and October 2, 1998, Plaintiffs, filed their Complaint and First Amended Complaint, respectively, pursuant to 42 U.S.C. § 1983, alleging, in addition to various state law claims, that Hauk violated Leghart's Fourth Amendment rights by using excessive force against him. In support of their claim, Plaintiffs aver that the physical evidence along with Hauk's own affidavit and deposition testimony clearly show that Leghart, apparently believing that he could fit his car into the space between the strategically parked patrol car and the Celebrity parked to the north, actually turned the steering wheel of the Mazda to the left in an attempt to escape. Plaintiffs further aver that in any event, Hauk killed Leghart as he, Hauk, was moving away from the Mazda and toward its rear bumper, while the Mazda was moving forward and away from him. Consequently, Plaintiffs assert that Leghart posed no threat to either Hauk or Lee and thus,

---

4. Leghart was released from prison approximately two weeks prior to March 30, 1998, having spent time there on an undisclosed charge.

5. The Court notes that Hauk's decision was directly contrary to established El Paso Police Department Use of Force Policy, Special Order C97–01, dated January 31, 1997, which prohibits a police officer from discharging a weapon "at the driver of a moving vehicle or at the vehicle itself unless the officer or another is in immediate danger of being struck by the vehicle and, in the case of an officer, the officer has no other means of escape or evasive action that the officer reasonably believes to be available." Hauk, however, indicated that he took evasive action by moving to the rear of the Mazda and to an open area of the parking lot.

Hauk's decision to discharge his weapon at Leghart was unreasonable and taken in "bad faith."

On July 24, 1998, Hauk filed his Motion to Dismiss and for Summary Judgment, arguing that he is entitled to qualified immunity with respect to the Fourth Amendment claim and official immunity for the pendant state law claims against him. According to Hauk, his actions on March 30, 1998, were objectively reasonable as a matter of law as he was in fear of imminent serious bodily injury or death at the time he fatally shot Leghart and that his actions in doing so were taken in "good faith." On October 2, 1998, Plaintiffs filed their Response to which Defendant filed his Reply five days later. The Court will first address Hauk's qualified immunity defense with respect to the alleged Fourth Amendment violation before proceeding to his immunity defense as to the pendant state law claims.

### Standard On Motion For Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure ("Rule 56") authorizes a motion for summary judgment so that actions which fail to present any genuine issue of material fact may be disposed of before trial. The standard for granting summary judgment requires that there be no genuine issue of material fact and that the moving party be entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986); *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994).

When making a determination under Rule 56, factual questions and inferences are viewed in a light most favorable to the non-movant. *See Lemelle v. Universal Mfg. Corp.,* 18 F.3d 1268, 1272 (5th Cir.1994). That is, the Court examines the pleadings, affidavits, and other evidence introduced in the motion, resolves any factual doubts in favor of the non-movant, and determines whether a triable issue of fact exists. *See*

*Aulds v. Foster,* 484 F.2d 945, 946 (5th Cir. 1973).

In the usual case, the party who seeks summary judgment must show by affidavit or other evidentiary materials that there is no genuine dispute as to any fact material to resolution of the motion. *See Celotex Corp.,* 477 U.S. at 325, 106 S.Ct. at 2553–54; *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4. Once the moving party has carried that burden, however, the burden shifts to the nonmoving party to show that summary judgment is not appropriate. *See Exxon Corp. v. Baton Rouge Oil,* 77 F.3d 850, 853 (5th Cir.1996); *Stults v. Conoco, Inc.,* 76 F.3d 651, 656 (5th Cir.1996). The nonmoving party cannot discharge this burden by referring to the mere allegations or denials of the nonmoving party's pleadings; rather, that party must, either by opposing evidentiary documents or by referring to evidentiary documents already in the record, set out specific facts showing a genuine issue as to a material fact exists. *See Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. at 2553; *Stults,* 76 F.3d at 656. The party opposing a motion supported by evidence cannot discharge his burden by alleging mere legal conclusions; instead, he must present affirmative evidence in order to defeat a properly supported motion for summary judgment. *See Anderson,* 477 U.S. at 248–55, 106 S.Ct. at 2509–10; *Matsushita Electrical Industrial Co., Ltd.,* 475 U.S. at 586, 106 S.Ct. at 1355–56. Non-movants are required to identify the specific evidence in the record and to articulate the precise manner in which that evidence supports their claim. *See Stults,* 76 F.3d at 656; *Forsyth v. Barr,* 19 F.3d 1527, 1537 (5th Cir.1994). Rule 56 does not require the district court to sift through the record in search of evidence to support a nonmovant's opposition to summary judgment. *See Forsyth,* 19 F.3d at 1537; *Skotak v. Tenneco Resins, Inc.,* 953 F.2d 909, 915 n. 7 (5th Cir.1992).

### Discussion

In general, the doctrine of qualified immunity was created in order to balance the interest of compensating persons whose federally protected rights have been violated against the fear that personal liability might

inhibit public officials in the discharge of their duties. *See Foster v. City of Lake Jackson,* 28 F.3d 425, 428 (5th Cir.1994) (citing *Johnston v. City of Houston,* 14 F.3d 1056, 1059 (5th Cir.1994) and *Spann v. Rainey,* 987 F.2d 1110, 1114 (5th Cir.1993)). As such, "[q]ualified immunity protects a police officer from liability if a reasonable competent law enforcement officer would not have known that his actions violated clearly established law." *Harper v. Harris County, Tex.,* 21 F.3d 597, 600 (5th Cir.1994) (citing *Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987)). "The objective reasonableness of the officer's conduct is measured with reference to the law as it existed at the time of the conduct in question." *Id.* (citing *King v. Chide,* 974 F.2d 653, 657 (5th Cir.1992)). "Therefore, the right the official is alleged to have violated must have been [so] clearly established at the time of the occurrence" that "a reasonable official would understand that what he is doing violates that right." *Id.; see also Anderson,* 483 U.S. at 640, 107 S.Ct. at 3039; *Johnston,* 14 F.3d at 1056.

■ "The evaluation of a claim of qualified immunity involves a two-step inquiry." *Colston,* 130 F.3d at 99 (citing *Harris,* 21 F.3d at 600). "The first step is to determine whether the plaintiff has alleged a violation of a clearly established constitutional right." *Id.* It is well established that "[w]here [a] suspect poses no immediate threat to [an] officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so," despite the existence of probable cause to arrest. *Tennessee v. Garner,* 471 U.S. 1, 11, 105 S.Ct. 1694, 1701, 85 L.Ed.2d 1 (1985). Thus, the use of deadly force under such circumstances thereby implicates the Fourth Amendment's guarantee against unreasonable seizures. *Id.* In the pleadings before the Court, it is undisputed that Plaintiffs have alleged a violation of an established constitutional right, namely, that Hauk's conduct in shooting and killing Leghart, as Leghart was allegedly attempting to escape while posing no threat to anyone, deprived Leghart of his right to be free from an unlawful seizure under the Fourth Amendment. Therefore, the parties, as well as the Court,

focus on the second step of the qualified immunity analysis.

■ "The second step requires the court to determine whether [Hauk's] conduct was objectively reasonable under existing clearly established law." *Colston,* 130 F.3d at 99. "Determining whether the force used to effect a ... seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham v. Connor,* 490 U.S. 386, 396, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989) (citations omitted). "[T]he test of reasonableness, [however,] is not capable of precise definition or mechanical application," and thus, "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses a threat of safety to the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight," with the resulting determination being a question of law. *Id.; see also Garner,* 471 U.S. at 8–9, 105 S.Ct. at 1699–1700 (the question is "whether the totality of the circumstances justifie[s] a particular sort of ... seizure"); *Bell v. Wolfish* 441 U.S. 520, 559, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447 (1979); *White v. Balderama,* 153 F.3d 237, 241 (5th Cir.1998).

■ According to Hauk, his use of deadly force against Leghart was objectively reasonable as a matter of law because he was in fear of imminent serious bodily injury or death at the time he fatally shot Leghart. More specifically, Hauk argues that based on the information provided to him by dispatch, by Plaintiff, and by others present at Plaintiff's residence on the night of March 30, 1998, regarding Leghart's propensity for violent confrontations with the police, drug use earlier that evening, and general contempt for returning to jail, a reasonable police officer in his position would have believed that Leghart was attempting to pin him between the Mazda and the Celebrity, as opposed to merely attempting to escape. Plaintiffs, on the other hand, argue that it was unreasonable for Hauk to believe that Leghart posed

a danger to him because at the time the fatal shots were fired, Hauk had moved to a position of safety. Moreover, Plaintiffs argue that the unreasonableness of Hauk's belief is fortified by the fact that at the time he approached the Leghart vehicle with his weapon drawn, Hauk was aware that his partner had called for backup which would be on the scene within minutes. Finally, Plaintiffs argue that in any event, Hauk was well aware that Leghart could not flee because the Mazda was "running on fumes" and Leghart wore a prosthetic leg, both of which would decrease his chances of fleeing successfully. While well-cognizant of the fact that "the 20/20 vision of hindsight" should not be employed in making a reasonableness determination and that "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments," the Court finds, after viewing the evidence in the light most favorable to Plaintiffs, that under a totality of the circumstances, outstanding issues of material fact exist with respect to whether Hauk could reasonably have believed that Leghart posed a threat of imminent serious bodily injury or death and, similarly, whether Hauk had a reasonable means to escape such threat if it did, in fact, exist. *See Graham*, 490 U.S. at 396–97, 109 S.Ct. 1865; *Terry v. Ohio*, 392 U.S. 1, 20–22, 88 S.Ct. 1868, 1879–81, 20 L.Ed.2d 889 (1968).

In light of the Fifth Circuit's recent opinion in *White v. Balderama*, 153 F.3d 237 (5th Cir.1998), regarding the problematic nature of reviewing district court denials of summary judgment in the qualified immunity context, the Court sets forth the following factual scenario upon which it relies and which precludes it from entering summary judgment in favor of Hauk on the basis of qualified immunity.

First, it is undisputed that Hauk's initial decision to attempt to make contact with Leghart upon first spotting him in the 7–Eleven parking lot was precipitated by his belief that Leghart was attempting to escape.

Furthermore, it is undisputed that after approaching the Leghart vehicle and finding Leghart disregarding his commands to exit the vehicle, Hauk noticed Leghart turn the steering wheel of the Mazda to the left and begin to race its engine. It is also clear that Hauk, at this point, began to move toward the rear of the vehicle and fired his first shot into the Mazda's left front tire in an attempt to disable it, despite the fact that this tactic was in direct contravention of established El Paso Police Department policy and that the Mazda was still stationary. The facts further show that after a brief delay, the Mazda began to move slightly forward and away from Hauk, and that Hauk, consequently, decided to fire another shot at its front tire. At this point, the parties' versions of the facts diverge.

According to Plaintiffs, when the Mazda continued moving forward and away from Hauk, he, Hauk, went into a "blind panic" and began firing his weapon at Leghart, while he, Hauk, was moving in the opposite direction of Leghart and the Mazda. Plaintiffs also argue, that in any event, based on the position of the Mazda and the Celebrity, Hauk had several avenues of safe retreat available which would have precluded the need for the fatal shots. Nevertheless, Hauk argues that, even though the Mazda did continue moving forward and away from him, it did, eventually, reverse direction toward him thereby necessitating the fatal shots.[6] Hauk asserts that it was at this point that he went into "automatic mode" and began "squeezing off rounds at the head and mass" of Leghart.

Although Hauk maintains that he was in fear of imminent serious bodily injury or death as a result of Leghart's actions, viewing the evidence in the light most favorable to the Plaintiffs and resolving any factual disputes in their favor, the Court finds that outstanding issues of material fact exist as to the Mazda's movement and whether Hauk had alternative means of safe escape available to him. As such, the Court simply

---

6. Without commenting on the weight of the evidence presented, the Court points out that Hauk's deposition testimony suggests that he never saw the Mazda moving backward and in his direction at any point during the encounter.

However, in his Reply to Plaintiff's Response, Hauk asserts through the affidavit testimony of Lee that, in fact, Plaintiff "reach[ed] down, mess[ed] with the gear shifter, and the vehicle proceeded in reverse."

cannot say as a matter of law, that a reasonable officer in Hauk's position would have believed that Leghart posed a threat of imminent serious bodily injury or death to Hauk or Lee, or that Hauk's decision to use deadly force was objectively reasonable under the totality of the circumstances. Thus, the Court concludes that Hauk's Motion to Dismiss and for Summary Judgment on grounds of qualified immunity with respect to the Fourth Amendment claim against him must be denied. Having so ruled on the federal claim of qualified immunity, the Court next addresses Hauk's official immunity defense with respect to the pendant state law claims.

 Under prevailing Texas law, "[g]overnment employees are entitled to official immunity from suit arising from their performance of (1) their discretionary duties in (2) good faith as long as they are (3) acting within the scope of their authority." *City of Lancaster v. Chambers*, 883 S.W.2d 650, 653 (Tex.1994). Because official immunity is an affirmative defense, a defendant who moves for summary judgment on the basis of official immunity must conclusively prove all essential elements of that defense. *See Vasquez v. Hernandez*, 844 S.W.2d 802, 805 (Tex.App. 1992, writ dism'd w.o.j.) (citing *Swilley v. Hughes*, 488 S.W.2d 64, 67 (Tex.1972)). In the instant case, it is undisputed that Hauk was a government officer acting within the scope of his authority and was performing discretionary duties on March 30, 1998. Thus, all that remains for review is whether his actions were taken in good faith.

To determine whether an officer's actions were grounded in good faith, Texas courts look "[t]o whether a reasonable officer could have believed his or her conduct to be lawful in light of clearly established law and the information possessed by the offic[er] at the time the conduct occurred." *Id.*[7] Once again, because the Court finds that outstanding issues of material fact exist with respect

to the Mazda's movement and whether Hauk had alternative means of safe escape available to him, as explained in greater detail above, the Court cannot say as a matter of law, that Hauk's decision to use deadly force was taken in "good faith" under the totality of the circumstances.[8]

Accordingly, **IT IS HEREBY ORDERED** that Defendant Hauk's Motion to Dismiss and for Summary Judgment is **DENIED**.

---

7. Despite the fact that *Chambers* concerned officers involved in high-speed pursuits, the court there noted that the test for the "good faith" component of official immunity in Texas "is derived substantially from the test that has emerged under federal qualified immunity in § 1983 actions." 883 S.W.2d at 656.

8. The Court is further troubled by Hauk's claim that his actions were taken in "good faith," given his decision to disregard El Paso Police Department Use of Force Policy, Special Order C97–01, dated January 31, 1997. *See* footnote 5, supra.