Filed 2/17/26  Sullivan v. City of Buena Park CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| DEANNA SULLIVAN, | |
| Plaintiff and Respondent, | G064558 |
| v. | (Super. Ct. No. 30-2020-01156902) |
| CITY OF BUENA PARK et al., | O P I N I O N |
| Defendants and Appellants. | |

Appeal from a judgment of the Superior Court of Orange County, Lee L. Gabriel, Judge. Reversed and remanded.

Ferguson, Praet & Sherman and Bruce D. Praet for Defendants and Appellants.

Dordick Law Corporation, Gary A. Dordick and John M. Upton for Plaintiff and Respondent.

A jury awarded plaintiff Deanna Sullivan $3.5 million in damages against Buena Park police officers Bobby Colon and Jennifer Tran for the wrongful death of her son, David Sullivan, during a 2019 traffic stop involving a stolen car. During the incident, which lasted several seconds, defendants fired their service weapons seven times, striking Sullivan four times, including a fatal shot. The incident was captured on Officer Colon's body-worn camera (BWC), the relevant portion of which was shown to the jury both in real time and as a series of still frames extracted from the BWC footage. After being instructed on legal standards applicable to a police officer's use of deadly force that were not in effect in California until *after* the incident occurred, the jury found defendants liable for wrongful death on theories of both negligence and battery.

On appeal, defendants raise numerous challenges to the judgment. First, they contend the trial court improperly admitted into evidence still shots of the BWC footage. Second, they contend the court erred by instructing the jury using the current versions of Judicial Council of California Civil Jury Instruction (CACI) Nos. 441 and 1305B, applicable to the use of deadly force by peace officers, which reflected significant changes in the law that were not in effect in 2019 when the incident occurred. Third, they contend the jury was instructed the damages award would be reduced by the percentage of Sullivan's comparative fault, when in fact the law does not permit any reduction based on comparative negligence when damages are awarded on an intentional tort theory. Finally, defendants contend the court improperly restricted defense counsel's closing argument.

We agree with defendants' second argument that the trial court erroneously instructed the jury on law applicable to the use of deadly force that was not in effect at the time of the incident and was not made

2

retroactive by the Legislature. We conclude the error was prejudicial and requires reversal of the judgment. We therefore need not address defendants' other issues on appeal.

The judgment is reversed, and the case is remanded for further proceedings before the trial court.

FACTS AND PROCEDURAL HISTORY

The incident that gave rise to this litigation occurred on August 19, 2019, and the trial took place in April and May of 2024.[1] The entire incident was captured on Officer Colon's BWC footage, which is part of the appellate record.[2] The footage begins as Officer Colon exited the passenger side of a marked police vehicle, carrying a mobile data terminal. He approached a black Range Rover that was stopped off the street. Moving to the driver's side of the vehicle, the driver (Sullivan) lowered the window as Officer Colon made contact with him. Sullivan appeared calm as he interacted with Officer Colon. When questioned, Sullivan stated he did not have his driver's license with him, the vehicle belonged to his cousin, and he was driving the vehicle with his cousin's permission. Officer Colon informed Sullivan the car's registration was expired and asked him to open the door so he could scan the vehicle identification number. Sullivan complied, and Officer Colon scanned the number. Officer Colon then returned to the police vehicle, entered the passenger seat, and spoke briefly with his partner,

---

[1] The case originally was tried in 2022 in the United States District Court for the Central District of California, where it ended in a mistrial due to a hung jury. Plaintiff then voluntarily dismissed her federal claims, and the state law claims were remanded to the Orange County Superior Court.

[2] Officer Tran did not turn on her BWC until after the shooting.

Officer Tran (who was sitting in the driver's seat). In the meantime, Officer Colon had provided the make and license plate of the Range Rover to dispatch. Sullivan remained in the vehicle. Dispatch responded with a code indicating the vehicle had been reported stolen.

Upon learning the vehicle had been reported stolen, Officer Colon exited the patrol car and Officer Tran followed suit. They both approached the driver's side of the Range Rover. Officer Colon opened the driver's side door and instructed Sullivan to "step out of the car." Sullivan did not comply. Instead, he started the engine and put the car in reverse. As the vehicle began moving backwards, both officers repeated their command.

Sullivan then accelerated in reverse, crossing a driveway, driving across a short stretch of grass, knocking over a palm tree, and then backing into the street, where it collided with a silver Mercedes that was driving by. Upon impact, Sullivan's vehicle came to a stop with the driver's door still open. Officer Colon drew his pistol and moved toward the stopped Range Rover. Sullivan exited the car through the open driver's side door and began running—first moving toward Officer Colon, seemingly retracing his route to where the Range Rover had been parked, then veering sharply to his right toward a nearby parking lot entrance. At that point, Sullivan was running in a direction roughly ninety degrees away from both officers, with his back facing them. Sullivan yelled obscenities as he was running. Officer Colon fired multiple rounds from his pistol as Sullivan ran.

Sullivan then abruptly turned and began running back towards the officers. The officers fired their weapons as he ran toward them. Sullivan then crouched down near the end of the driveway and rolled onto his left side and then onto his back. It was later determined one of the bullets had entered his side and passed through his heart, killing him. The officers

approached Sullivan, turned him onto his stomach, and handcuffed his hands behind his back. The officers did not pat down Sullivan for weapons during the arrest. After the incident, Sullivan was found to be unarmed.

Prior to trial, defendants moved in limine to limit the introduction of the BWC video footage to "real time only without slow motion, screen shots or any other method or format which would alter the original video," and to "preclude any witness, expert or attorney from relying upon or in any manner referencing any aspect of any BWC video in manner other than real time, including the use, reference to or introduction of slow-motion, screen shots or any other altered format." Plaintiff opposed the motions, and later clarified at the hearing on them that the video would not be played for the jury in slow motion so the jury "gets this distorted view," but rather only in "live time, in real-time." The trial court heard argument from counsel and denied the motions, finding the still shots and accompanying testimony more probative than prejudicial.[3] Defendants did not request, and the trial court did not give the jury, any limiting instruction regarding the proper use and consideration of the still photos. Likewise, defendant did not request, and the

---

[3] The trial court found defendants' arguments of potential undue prejudice went to weight, not admissibility, and stated "[t]here's no distortion of the video that's going to take place. It is still just snapshots in time of a very, very quick and short video, but it's an accurate depiction."

court did not issue, any specific order regarding the scope of expert testimony regarding the still photos.[4]

At trial, plaintiff proceeded on her wrongful death claim based on theories of negligence and battery. Defendants alleged Sullivan was at fault for his own death and they were defending themselves from an obvious, imminent attack by Sullivan.

The trial court instructed the jury on plaintiffs' theories of negligence and battery using CACI Nos. 441 (Negligent Use of Deadly Force by Peace Officer) and 1305B (Battery by Peace Officer (Deadly Force)). The jury found defendants liable on both causes of action. The jury also found Sullivan's own negligence was a substantial factor in causing his own death and that he was 58 percent at fault. The jury awarded plaintiff $3.5 million in noneconomic damages.

Following trial, the parties briefed whether the damages award should be reduced to reflect Sullivan's comparative negligence, and whether there was an inconsistency in the verdict in light of the jury instruction on "Comparative Fault of Decedent" (CACI No. 407). The court ruled on this issue on June 13, 2024, declining to adjust the amount of damages awarded to plaintiff to reflect the jury's finding of comparative negligence on the part of Sullivan. Defendants moved for reconsideration and plaintiff opposed the

[4] The entire BWC footage is 20 minutes in length, much of which captured what transpired after the shooting; thus, only a small portion of the entire video was played for the jury. After a discussion between the court and counsel regarding how much of the video should be played to the jury, the court permitted counsel to show the jury (in real time) approximately four minutes of the video starting from the beginning, when defendants first initiated the stop and encountered Sullivan. The court also permitted the parties to play other discrete portions of the video during the trial, as well as still shots from every frame of the BWC footage shown to the jury.

6

motion. The trial court denied the motion for reconsideration and entered judgment against the officer defendants for the full amount of the jury's award.[5] Defendants timely appealed.

## DISCUSSION

### IT WAS REVERSIBLE ERROR TO RETROACTIVELY HOLD DEFENDANTS TO THE NEW STANDARDS FOR USING DEADLY FORCE, WHICH WERE NOT IN EFFECT AT THE TIME OF THE INCIDENT

Defendants contend the trial court improperly instructed the jury using CACI Nos. 441 and 1305B, which were created by the Judicial Council following the Legislature's adoption of Assembly Bill No. 392 (2019–2020 Reg. Sess.) (Assembly Bill 392), which amended both Penal Code sections 835a and 196 (defining when homicide committed by peace officers is justifiable). According to defendants, Assembly Bill 392—which became effective in January 2020—substantially restricted a police officer's use of deadly force by creating a standard that made use of deadly force unlawful unless it was "necessary" and there were no feasible alternatives. The parties agree the Legislature did not make the statute retroactive. Nonetheless, plaintiff contends it was proper to instruct the jury using CACI Nos. 441 and 1305B because Penal Code section 835a did not create new duties but simply

---

[5] Although named as a defendant in the lawsuit, the City of Buena Park (City) is not named in the judgment. According to the appellate record, all direct claims against the City were dismissed by the federal court prior to remand, defendants agreed the City would be vicariously liable for any judgment against the officer defendants, and the trial proceeded only against the officer defendants in their individual capacities.

7

expressed the previous, long-standing duty in clearer terms. Plaintiff argues the alternative CACI instructions proposed by defendants were outdated.

We agree with defendants on the instructional error. The 2020 amendment to Penal Code section 835a did significantly change the standards applicable to officers' use of deadly force, but it was not made retroactive and could not properly be applied to the officers' conduct in this 2019 incident. We do not, however, decide whether the specific instructions proposed by defendants (which were modified versions of CACI Nos. 440 and 1305), accurately reflected the standards applicable to the use of deadly force by peace officers as of the date of the incident.[6] We leave that for the trial court to determine on remand.

*A. Standard of Review*

We review challenges to jury instructions de novo. (*Drury v. Ryan* (2025) 109 Cal.App.5th 1102, 1108.) Instructional error in a civil case is not grounds for reversal unless it is probable the error "'prejudicially affected the verdict.'" (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 580.) In determining whether instructional error was prejudicial, a reviewing court must evaluate "(1) the state of the evidence, (2) the effect of other

---

[6] The parties appear to agree that at least some portions of CACI Nos. 441 and 1305B and Penal Code section 835a, as amended, incorporated pre-existing "objective reasonableness" standards under the Fourth Amendment governing the use of excessive force by law enforcement officers, which were established by the United States Supreme Court in *Tennessee v. Garner* (1985) 471 U.S. 1 (*Garner*) and *Graham v. Connor* (1989) 490 U.S. 386 (*Graham*) and have been followed by California courts deciding excessive force claims against law enforcement. (See *Hernandez v. Pomona* (2009) 46 Cal.4th 501, 513–514.) These standards were in effect well before the incident and made California's statutory law outdated prior to the passage of Assembly Bill 392.

instructions, (3) the effect of counsel's arguments, and (4) any indications by the jury itself that it was misled." (*Id.* at pp. 580–581.)

*B. California Law Before and After the Adoption of Assembly Bill 392*

At the time of the 2019 incident, Penal Code section 835a had not been amended since its adoption in 1957. It provided that a peace officer "who has reasonable cause to believe that the person to be arrested has committed a public offense may use reasonable force to effect the arrest, to prevent escape or to overcome resistance. [¶] A peace officer who makes or attempts to make an arrest need not retreat or desist from his efforts by reason of the resistance or threatened resistance of the person being arrested; nor shall such officer be deemed an aggressor or lose his right to self-defense by the use of reasonable force to effect the arrest or to prevent escape or to overcome resistance." (Former Pen. Code, § 835a; Stats. 1957, ch. 2147, § 11, p. 3807.)

Following the incident—and effective January 1, 2020—the Legislature enacted Assembly Bill 392, adopting sweeping changes to Penal Code section 835a and providing as follows:

"(a) The Legislature finds and declares all of the following:

"(1) That the authority to use physical force, conferred on peace officers by this section, is a serious responsibility that shall be exercised judiciously and with respect for human rights and dignity and for the sanctity of every human life. The Legislature further finds and declares that every person has a right to be free from excessive use of force by officers acting under color of law.

"(2) As set forth below, it is the intent of the Legislature that peace officers use deadly force only when necessary in defense of human life. In determining whether deadly force is necessary, officers shall evaluate each situation in light of the particular circumstances of each case, and shall use

9

other available resources and techniques if reasonably safe and feasible to an objectively reasonable officer.

"(3) That the decision by a peace officer to use force shall be evaluated carefully and thoroughly, in a manner that reflects the gravity of that authority and the serious consequences of the use of force by peace officers, in order to ensure that officers use force consistent with law and agency policies.

"(4) That the decision by a peace officer to use force shall be evaluated from the perspective of a reasonable officer in the same situation, based on the totality of the circumstances known to or perceived by the officer at the time, rather than with the benefit of hindsight, and that the totality of the circumstances shall account for occasions when officers may be forced to make quick judgments about using force.

"(5) That individuals with physical, mental health, developmental, or intellectual disabilities are significantly more likely to experience greater levels of physical force during police interactions, as their disability may affect their ability to understand or comply with commands from peace officers. It is estimated that individuals with disabilities are involved in between one-third and one-half of all fatal encounters with law enforcement.

"(b) Any peace officer who has reasonable cause to believe that the person to be arrested has committed a public offense may use objectively reasonable force to effect the arrest, to prevent escape, or to overcome resistance.

"(c)(1) Notwithstanding subdivision (b), a peace officer is justified in using deadly force upon another person only when the officer reasonably believes, based on the totality of the circumstances, that such force is

necessary for either of the following reasons: [¶] (A) To defend against an imminent threat of death or serious bodily injury to the officer or to another person. [¶] (B) To apprehend a fleeing person for any felony that threatened or resulted in death or serious bodily injury, if the officer reasonably believes that the person will cause death or serious bodily injury to another unless immediately apprehended. Where feasible, a peace officer shall, prior to the use of force, make reasonable efforts to identify themselves as a peace officer and to warn that deadly force may be used, unless the officer has objectively reasonable grounds to believe the person is aware of those facts. [¶] (2) A peace officer shall not use deadly force against a person based on the danger that person poses to themselves, if an objectively reasonable officer would believe the person does not pose an imminent threat of death or serious bodily injury to the peace officer or to another person.

"(d) A peace officer who makes or attempts to make an arrest need not retreat or desist from their efforts by reason of the resistance or threatened resistance of the person being arrested. A peace officer shall not be deemed an aggressor or lose the right to self-defense by the use of objectively reasonable force in compliance with subdivisions (b) and (c) to effect the arrest or to prevent escape or to overcome resistance. For the purposes of this subdivision, 'retreat' does not mean tactical repositioning or other de-escalation tactics.

"(e) For purposes of this section, the following definitions shall apply: [¶] (1) 'Deadly force' means any use of force that creates a substantial risk of causing death or serious bodily injury, including, but not limited to, the discharge of a firearm. [¶] (2) A threat of death or serious bodily injury is 'imminent' when, based on the totality of the circumstances, a reasonable officer in the same situation would believe that a person has the present

11

ability, opportunity, and apparent intent to immediately cause death or serious bodily injury to the peace officer or another person. An imminent harm is not merely a fear of future harm, no matter how great the fear and no matter how great the likelihood of the harm, but is one that, from appearances, must be instantly confronted and addressed. [¶] (3) 'Totality of the circumstances' means all facts known to the peace officer at the time, including the conduct of the officer and the subject leading up to the use of deadly force." (Pen. Code, § 835a, as amended by Stats. 2019, ch. 170, § 2, eff. Jan. 1, 2020.)[7]

At the time of the incident, Penal Code section 196 had not been amended since its enactment in 1872, and it provided as follows: "Homicide is justifiable when committed by public officers and those acting by their command in their aid and assistance, either—[¶] 1. In obedience to any judgment of a competent Court; or, [¶] 2. When necessarily committed in overcoming actual resistance to the execution of some legal process, or in the discharge of any other legal duty; or, [¶] 3. When necessarily committed in retaking felons who have been rescued or have escaped, or when necessarily committed in arresting persons charged with felony, and who are fleeing from justice or resisting such arrest." (Former Pen. Code, § 196.)

However, Assembly Bill 392 also amended Penal Code section 196. Effective January 1, 2020, it now states as follows: "Homicide is justifiable when committed by peace officers and those acting by their command in their aid and assistance, under either of the following circumstances: [¶] (a) In obedience to any judgment of a competent court. [¶]

---

[7] The statute was amended without substantive change effective January 1, 2026. (Stats. 2025, ch. 241, § 24.)

12

(b) When the homicide results from a peace officer's use of force that is in compliance with Section 835a." (Pen. Code, § 196, as amended by Stats. 2019, ch. 170, § 1.)

*C. Jury Instructions*

Following the adoption of Assembly Bill 392, the Judicial Council adopted CACI No. 1305B (new as of May 2021) and CACI No. 441 (new as of November 2020), to reflect the changes to Penal Code section 835a.

1. CACI 1305B (Battery by Police Officer (Deadly Force)— Essential Factual Elements)

With respect to plaintiff's battery claim, the jury was instructed as follows using CACI 1305B:

"A law enforcement officer may use deadly force only when necessary in defense of human life. [Plaintiff] claims that [defendants] unnecessarily used deadly force on [Sullivan]. To establish this claim, [plaintiff] must prove all of the following:

"1. That [Colon and/or Tran] intentionally shot [Sullivan] or caused [Sullivan] to be shot;

"2. That [Colon and/or Tran] used deadly force on [Sullivan];

"3. That [Colon and/or Tran's] use of deadly force was not necessary to defend human life;

"4. That [Sullivan] was killed; and

"5. That [Colon and/or Tran's] use of force was a substantial factor in causing [Sullivan's] death.

"[Colon and/or Tran's] use of deadly force was necessary to defend human life only if a reasonable officer in the same situation would have believed, based on the totality of the circumstances known to or perceived by [Colon and/or Tran] at the time, that deadly force was necessary to defend

13

against an imminent threat of death or serious bodily harm to [Colon and/or Tran].

"A law enforcement officer must not use deadly force against persons based only on the danger those persons pose to themselves, if an objectively reasonable officer would believe the person does not pose an imminent threat of death or serious bodily injury to the law enforcement officer or to another person.

"A person being arrested or detained has a duty not to use force to resist the peace officer unless the law enforcement officer is using unreasonable force.

"'Deadly force' means any use of force that creates a substantial risk of causing death or serious bodily injury, including, but not limited to, the discharge of a firearm.

"A threat of death or serious bodily injury is 'imminent' when, based on the totality of the circumstances, a reasonable officer in the same situation would believe that a person has the present ability, opportunity, and apparent intent to immediately cause death or serious bodily injury to the law enforcement officer or another person. An imminent harm is not merely a fear of future harm, no matter how great the fear and no matter how great the likelihood of the harm, but is one that, from appearances, must be instantly confronted and addressed.

"'Totality of the circumstances' means all facts known to the law enforcement officer at the time, including the conduct of [Colon and/or Tran] and [Sullivan] leading up to the use of deadly force. In determining whether [Colon and/or Tran's] use of deadly force was necessary in defense of human life, you must consider [Colon and/or Tran's] tactical conduct and decisions before using deadly force on [Sullivan] and whether [Colon and/or Tran] used

14

other available resources and techniques as alternatives to deadly force, if it was reasonably safe and feasible to do so.

"A law enforcement officer who makes or attempts to make an arrest does not have to retreat or stop because the person being arrested is resisting or threatening to resist. Tactical repositioning or other de-escalation tactics are not retreat. A law enforcement officer does not lose the right to self-defense by use of objectively reasonable force to effect the arrest or to prevent escape or to overcome resistance. A law enforcement officer does, however, have a duty to use reasonable tactical repositioning or other de-escalation tactics."

2. CACI 441 (Negligent Use of Deadly Force by Peace Officer—Essential Factual Elements)

With respect to plaintiff's negligence claim, the jury was instructed as follows using CACI 441:

"A law enforcement officer may use deadly force only when necessary, in defense of human life. [Plaintiff] claims that [defendants] were negligent in using deadly force to arrest, prevent escape of, or overcome resistance to them. To establish this claim, [plaintiff] must prove all of the following:

"1. That [defendants] were law enforcement officers;

"2. That [Colon and/or Tran] used deadly force on [Sullivan];

"3. That [Colon and/or Tran's] use of deadly force was not necessary to defend human life;

"4. That [Sullivan] was killed; and

"5. That [Colon and/or Tran's] use of force was a substantial factor in causing [Sullivan's] death.

15

"[Colon and/or Tran's] use of deadly force was necessary to defend human life only if a reasonable officer in the same situation would have believed, based on the totality of the circumstances known to or perceived by [Colon and/or Tran] at the time, that deadly force was necessary:

"1. To defend against an imminent threat of death or serious bodily injury to [defendants];

"A law enforcement officer must not use deadly force against persons based only on the danger those persons pose to themselves, if an objectively reasonable officer would believe the person does not pose an imminent threat of death or serious bodily injury to the law enforcement officer or to another person.

"A person being arrested has a duty not to use force to resist a law enforcement officer unless the law enforcement officer is using unreasonable force.

"'Deadly force' is force that creates a substantial risk of causing death or serious bodily injury. It is not limited to the discharge of a firearm.

"A threat of death or serious bodily injury is 'imminent' if, based on the totality of the circumstances, a reasonable officer in the same situation would believe that a person has the present ability, opportunity, and apparent intent to immediately cause death or serious bodily injury to the peace officer or to another person. An imminent harm is not merely a fear of future harm, no matter how great the fear and no matter how great the likelihood of the harm, but is one that, from appearances, must be instantly confronted and addressed.

"'Totality of the circumstances' means all facts known to or perceived by the law enforcement officer at the time, including the conduct of [Colon and Tran] and [Sullivan] leading up to the use of deadly force. In

16

determining whether [defendants'] use of deadly force was necessary in defense of human life, you must consider [Colon and/or Tran's] tactical conduct and decisions before using deadly force on [Sullivan] and whether [Colon and/or Tran] used other available resources and techniques as alternative [*sic*] to deadly force, if it was reasonably safe and feasible to do so to an objectively reasonable officer.

"A law enforcement officer who makes or attempts to make an arrest does not have to retreat or stop because the person being arrested is resisting or threatening to resist. Tactical repositioning or other de-escalation tactics are not retreat. A law enforcement officer does not lose the right to self-defense by use of objectively reasonable force arrest, prevent escape, or overcome resistance."

*D. Analysis*

Defendants contend the following provisions of Penal Code section 835a, as amended, created heightened standards that were not in existence at the time of the incident: (1) "[A] peace officer is justified in using deadly force upon another person only when the officer reasonably believes, based on the totality of the circumstances, that such force is *necessary* . . . [¶] (A) To defend against an imminent threat of death or serious bodily injury to the officer or to another person" (Pen. Code, § 835a, subd. (c)(1), italics added), and (2) "officers . . . shall use other available resources and techniques if reasonably safe and feasible" in determining whether deadly force is necessary (*id.*, subd. (a)(2)).

We agree. Prior to the enactment of Assembly Bill 392, California statutory law—in particular, former Penal Code sections 192 and 835a—did not state an officer may use deadly force only when necessary and when no alternative is feasible. Although some courts that examined the

17

constitutional limits of the use of force by peace officers have referenced necessity *as a factor* in evaluating the reasonableness of an officer's actions, we found no authority, and the parties have cited none, that held an officer's use of deadly force must have been necessary. (See *Garner, supra*, 471 U.S. at p. 3 [deadly force may not be used unless it is "necessary to prevent the escape [of an apparently unarmed suspected felon] and the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others"]; *Graham, supra*, 490 U.S. at pp. 396–397 [*one of the factors* in determining reasonableness is "whether the suspect poses an immediate threat to the safety of the officers or others"; "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation"]; *Brown v. Ransweiler* (2009) 171 Cal.App.4th 516, 528 ["A police officer's use of deadly force is reasonable if ""the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others.' [Citations.]" [Citation.]' [Citation.] "'Thus, 'an officer may reasonably use deadly force when he or she confronts an armed suspect in close proximity whose actions indicate an intent to attack"""].)

"In determining whether a statute clarified or changed the law, we give 'due consideration' to the Legislature's intent in enacting that statute." (*In re Marriage of Fellows* (2006) 39 Cal.4th 179, 184.) Here, in examining whether the use of the term "necessary" merely clarified existing law or articulated a new, higher standard, we need look no further than the explicit language of the new statute, which states "it is the intent of the Legislature that peace officers use deadly force only when necessary in

18

defense of human life" and "[i]n determining whether deadly force is necessary, officers shall evaluate each situation in light of the particular circumstances of each case, and *shall use other available resources and techniques* if reasonably safe and feasible to an objectively reasonable officer." (Pen. Code, § 835a, subd. (a)(2), italics added.) The requirement that peace officers consider feasible alternatives before using deadly force reflects a material change in the law. Prior to the enactment of Penal Code section 835a, California courts had held "'where deadly force is otherwise justified under the Constitution, there is no constitutional duty to use non-deadly alternatives first. . . .'" (*Martinez v. County of Los Angeles* (1996) 47 Cal.App.4th 334, 348.)

The legislative history to Assembly Bill 392, as well as comments by the Judicial Council regarding the revised jury instructions created to reflect the new statute, also support our conclusion that Assembly Bill 392 made more stringent under California law the standards for a peace officer's use of deadly force. As set forth in the report on Assembly Bill 392 from the Assembly Committee on Public Safety: "For nearly a century and a half Californians have witnessed the justification of police homicides due to a standard that says it can be reasonable to use deadly force *even if there were other alternatives.*" (Assem. Com. on Public Safety, Rep. on Assem. Bill 392, as amended Mar. 29, 2019, p. 5, italics added.) "[Assembly Bill] 392 updates [the language of Penal Code section 835a] and specifies that, in California: [¶] *Peace officers are justified in using deadly force upon another person only when the officer reasonably believes, based on the totality of the circumstances, that such force is necessary for either of the following reasons:* [¶] *To defend against an imminent threat of death or serious bodily injury to the officer or to another person; or* [¶] *[t]o apprehend a fleeing person for any felony that*

19

*threatened or resulted in death or serious bodily injury, if the officer reasonably believes that the person will cause death or serious bodily injury to another unless immediately apprehended. . . .* [¶] Unlike existing California statutory law, the provisions of this bill would exceed the standards articulated and set forth by the U.S. Supreme Court in *Graham* and *Garner*." (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill 392, as amended May 23, 2019, p. 6, italics in original.)

Notably, the Judicial Council reached the same conclusion when it adopted CACI No. 441 to reflect the changes made to Penal Code section 835a as they relate to the negligent use of deadly force by a peace officer. (Judicial Council of Cal., Civ. Jury Instns. (2021 ed.) Directions for Use to CACI No. 441, p. 324 ["Penal Code section 835a preserves the 'reasonable force' standard for nondeadly force, but creates a *separate, higher standard* that authorizes a peace officer to use deadly force only when 'necessary in defense of human life'" (italics added)].)[8]

---

[8] At oral argument, counsel for defendants argued *Garner* expressly held the use of deadly force by law enforcement must be "necessary." (*Garner, supra*, 471 U.S. at p. 3.) That was not *Garner's* holding. *Garner's* use of the word "necessary" was in the context of when law enforcement may use deadly force with respect to an unarmed fleeing suspect. (*Ibid.*) The court held deadly force must be necessary *to prevent the suspect's escape* and, in addition, the officer must have "probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." (*Ibid.*) California's requirement in Assembly Bill 392 that deadly force be *necessary* to defend against an imminent threat of death or serious bodily injury—which includes consideration of whether a peace officer could have used other resources or techniques as feasible alternatives to deadly force—is a more stringent standard than *Garner's* standard of probable cause to believe the suspect poses a significant threat of death or serious physical injury to the officer or others.

Plaintiff correctly points out our colleagues in the Third District have noted that "[r]elevant portions of this amended section [Penal Code section 835a] are declaratory of preexisting case law." (*Koussaya v. City of Stockton* (2020) 54 Cal.App.5th 909, 934.) We find no inconsistency with *Koussaya's* conclusion regarding Assembly Bill 392 in the context of that case and the conclusion we reach here. The court in *Koussaya* was referring to law that already existed before the enactment of Assembly Bill 392 that an officer's preshooting conduct must be considered as part of the totality of the circumstances in assessing the reasonableness of the officer's use of deadly force. (*Koussaya,* at p. 935.) The *Koussaya* court did not hold that *all* provisions of Assembly Bill 392, including those at issue in this case, are declaratory of existing law as it stood prior to its enactment.

In conclusion, we hold the trial court erred in instructing the jury using CACI Nos. 441 and 1305B, as adopted by the Judicial Council following the 2019 incident in this case, because the amendment to Penal Code section 835a that was reflected in those jury instructions was not made retroactive by the Legislature and it holds peace officers to a new and more stringent standard for assessing when they can lawfully use deadly force.[9] (See *Californians for Disability Rights v. Mervyn's, LLC* (2006) 39 Cal.4th 223, 231 [addressing whether the application of a law is impermissibly retroactive].)

_____

[9] Once again, there does not appear to be any meaningful dispute between the parties that portions of Penal Code section 835a and CACI Nos. 441 and 1305B reflected—and did not change—existing law and that the instructions proposed by defendants were outdated. In concluding the trial court erred in instructing the jury using CACI Nos. 441 and 1305B, we are not holding the court is prevented from using some modified versions of these instructions so long as the jury is instructed on the law as it existed at the time of the incident.

*E. The Error Was Prejudicial*

"An instructional error is prejudicial when it is reasonably probable that the appellant would have gotten a more favorable result in its absence. [Citation.] 'While there is no precise formula for measuring the effect of an erroneous instruction [citation], a number of factors are considered in measuring prejudice: (1) the degree of conflict in the evidence on critical issues [citations]; (2) whether respondent's argument to the jury may have contributed to the instruction's misleading effect [citation]; (3) whether the jury requested a rereading of the erroneous instruction [citation] or of related evidence [citation]; (4) the closeness of the jury's verdict [citation]; and (5) the effect of other instructions in remedying the error [citations].'" (*Drury v. Ryan, supra*, 109 Cal.App.5th at pp. 1112–1113.)

We conclude it was not harmless error to instruct the jury to consider whether it was necessary for defendants to use deadly force against Sullivan and whether defendants could have feasibly used alternative means. As discussed above, the jury instructions held defendants to a higher standard than was applicable at the time of the incident. Plaintiff's counsel told the jury in both opening statement and closing argument that deadly force may only be used if it was necessary. In addition, plaintiff's counsel argued to the jury (in reference to and consistent with the erroneous CACI instructions given) that defendants failed to use other available resources and techniques rather than deadly force: "Like you use a baton, use a taser, use the bean bag. Wait for more officers. They had all sorts of other things they could have and should have done. And the law expects them to use these

tactics, use these other things. Why? Because the last possible option is to kill."

We have no difficulty concluding it was reasonably probable defendants would have obtained a different result had the jury been properly instructed on the law. The error was reversible.[10]

## DISPOSITION

The judgment is reversed and remanded for further proceedings in the trial court. Defendants shall recover costs on appeal.


GOODING, J.

WE CONCUR:


MOTOIKE, ACTING P. J.


DELANEY, J.

---

[10] In light of our decision to reverse the judgment, we need not reach defendants' other contentions on appeal, including (1) whether the trial court abused its discretion in admitting the still photos into evidence at trial, (2) whether the jury was misled by CACI No. 407 and the special verdict form into believing the damages they awarded to plaintiff based on a finding that defendants were liable for both negligence and battery would be reduced by the percentage of fault they attributed to Sullivan as a result of his own negligence, and (3) whether the court abused its discretion in limiting aspects of defense counsel's closing argument.